224 N.J. Super. 105 (1988)
539 A.2d 1230
IN THE MATTER OF WILLIAM J. DEMARCO, AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY, CONTEMNOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 29, 1988.
Decided March 23, 1988.
*107 Before Judges PETRELLA, BAIME and ASHBEY.
William J. DeMarco, attorney for appellant William J. DeMarco (Richard J. Baldi on the brief).
W. Cary Edwards, Attorney General of New Jersey, attorney for respondent State of New Jersey. (Jessica S. Oppenheim, Deputy Attorney General, of counsel and on the brief).
PER CURIAM.
Attorney William J. DeMarco appeals from determinations finding him guilty of two separate contempts in the face of the court. R. 1:10-1. He argues on this appeal that he should *108 have been allowed to obtain an adjournment to get transcripts of the colloquy which occurred during a gambling conspiracy trial captioned State v. Carmine Mancinelli et al. He also argues that alternatively the trial judge should have handled all of the contempt proceedings in accordance with the procedures under R. 1:10-2. Finally, he argues that statements he made to the trial judge were not contumacious per se when reviewed in the context of the trial proceedings contemporaneous with the statements. On this appeal we consider the matter de novo and make independent findings. R. 2:10-4.
During pre-trial proceedings on December 9, 1986 about whether the press and the public should have access to particular documents, DeMarco challenged what he referred to as the far-reaching nature of the proposed form of order. He posed and answered a hypothetical question by saying that the judge would stop the trial and produce the documents even to school children who might be observing the trial. DeMarco stated "[t]hat's what you want to happen, obviously, because you want this order to be signed." The transcript reveals the following colloquy:
THE COURT: I repeat, Mr. DeMarco, I made no decision. I don't want this order to be signed, as you put it.
Now, please present your arguments as an attorney should present arguments.
MR. DE MARCO: I am presenting my argument.
THE COURT: I made my position. I have an open mind.
MR. DE MARCO: You say you have an open mind. It is my experience during the course of this limited pretrial proceeding that every argument defense counsel has made has been confronted with your absolute certainty about how wrong we are.
THE COURT: Mr. DeMarco, that statement borders on being contemptuous.
We'll have a recess.
MR. DE MARCO: If you feel I'm contemptuous you have a remedy.
THE COURT: Mr. DeMarco 
MR. DE MARCO: If you feel I'm contemptuous 
The court recessed, and advised DeMarco that it was instituting a summary contempt proceeding under R. 1:10-1 and directed him to immediately show cause why he should not be held in *109 contempt and adjudged summarily because of statements which the judge then read (presumably after having the court reporter transcribe the few pages of the record that were involved). The court noted that DeMarco had refused to calm down and said twice that if the judge felt that he was being contemptuous, he had a remedy. DeMarco then asked for a recess of about 20 to 30 minutes. The court granted the recess and DeMarco requested Joseph Afflitto, an attorney representing a codefendant, to represent him in the contempt proceeding. The court then rejected a request by counsel for a further adjournment to study the transcript and indicated that if it was a question of an hour or two to have the court reporter read back whatever transpired, he would gladly do that, but he would not adjourn the hearing beyond that. The court then stated that it would give counsel a few hours and continued the matter until 1:30 p.m. Because the issue raised by the press had not been resolved, the court decided to complete the hearing on the proposed form of order before addressing the contempt hearing. When DeMarco was heard concerning the proposed form of order, he stated:
[MR. DE MARCO:] ... The press and the Court and Greco says the press is the vehicle of the public and in that manner they get to know what's in the transcript because they use the press. But nowhere do I see any one of these cases  I'm sorry, was I disturbing the Court? [Emphasis added].
THE COURT: Mr. DeMarco, what's the purpose of that statement?
MR. DE MARCO: I saw you were  you just leaned back quickly. I thought I was disturbing the Court.
THE COURT: Are you baiting the Court once again, Mr. DeMarco?
MR. DE MARCO: I have never baited the Court before. I think you are baiting me now. I really can't finish.
THE COURT: There you go again.
MR. DE MARCO: I can't continue the argument. Every time you argue something 
THE COURT: Please finish.
MR. DE MARCO: I really can't. I can't. I got a threat of contempt over my head. I'm making a legitimate argument to you. You're accusing me of baiting.
THE COURT: I'm listening to you.
MR. DE MARCO: I really can't continue when I get accused of baiting a Court when I'm making a legitimate argument. You know, it begins to  I begin to be *110 frightened to say anything. The next thing you're going to hold me in contempt for the way I sit down.
THE COURT: You are to present your arguments.
MR. DE MARCO: I'm sorry, I cannot continue.
The summary contempt proceeding continued on December 10, 1986 and the judge included the statements made by DeMarco at the end of the morning hearing. The judge stated that he did not defer the hearing partially because DeMarco had been abusive to him one day when a "Mr. Bidnik" was in the courtroom. However, he stated that for purposes of the contempt hearing he was not considering, and would not "consider anything other than appear[ed] in [the] transcript." After this hearing was completed the judge withheld adjudication until the conclusion of the trial. There appears to have been no adjudication ever made with respect to this incident. The judge apparently took no further action with reference to the earlier remarks of DeMarco on December 9, and 10, 1986. Whether this was due to the court's acceptance of counsel's suggestion that perhaps time might cool things down does not appear in the record. The judge may have thought this was enough warning or that after reflection DeMarco might offer some form of apology for what occurred. Since there is no adjudication relative to December 9, we do not consider it. We do note that the record reflects a disrespectful and defiant attitude of counsel toward the court.
On December 15, 1986, while the judge was hearing arguments about the admissibility of transcripts of certain intercepted telephone conversations, DeMarco indicated to the judge that he would use in cross-examination the fact that there were mistakes as to dates and times. The prosecutor then argued:
MR. CAMPOLO: What I wanted to say, we even got back to format here, the format for each one of these transcripts vary significantly. There's not even any assumption that any of this introductory matter, other than the actual transcripts, will ultimately be permitted to the jury because someone who sponsors in this evidence will have to testify about the date and time.
This is a question of really housekeeping for the Court, whether you want to allow this sort of introductory information on the transcript, whether some counsel may reserve the right [to] redact it altogether.

*111 Again, I'm looking for some simplicity here, and defense counsel even concedes that we're correcting these transcripts as we go through. Some of the words are inaccurate, some of them are misspelled, there are differences of interpretation.
And for them now to argue that somehow the mistyping of the day of the week on one of these transcripts by some unknown person somehow raises a crucial issue of cross-examination, is preposterous. I think it's a fraud, and I would  [Emphasis supplied].
DeMarco objected, arguing that if the prosecutor wanted to get personal, he was "fooling with the wrong crowd."[1] The following colloquy occurred:
THE COURT: I would urge counsel 
MR. DE MARCO: Urge the Prosecutor, he started it and I'll finish it.
THE COURT: Please at all times conduct yourselves as attorneys. And if you avoid the use of strong language, please avoid it when referring to the argument of your adversaries.
MR. DE MARCO: I object to when I raise an argument that it be called a fraud, and I want an apology.
MR. CAMPOLO: I will not apologize.
MR. DE MARCO: Your Honor 
THE COURT: We were going to proceed.
MR. DE MARCO: Wait a minute.
THE COURT: We are going to proceed.
MR. DE MARCO: I think that language was more contemptuous than what I said to this Court, and you let him get away with [it].
THE COURT: We are going to proceed. I've got to have this case completed. I'm not going to have counsel obstruct the continuation of this case.
MR. DE MARCO: Judge, you overlook if defense counsel in pursuit of a Constitutional issue uses strong language, you want to hold him in contempt. But the Prosecutor can get up and patch up his case and call the defense a fraud and you let him get away with.
I don't think you're being fair now, Judge. You have to be evenhanded to both sides, and you're not being that way.
THE COURT: All right. The Court notes that once again Mr. DeMarco is attacking the integrity of the Court; and I want a copy of this transcript.
MR. DE MARCO: See, Judge, it's another example, the State can get up and make remarks and the Court just let's it go. When defense counsel stands up and defends his clients in defense of his client's rights, you use every intimidating method you know how to try and silence the defense. [Emphasis supplied].
*112 The judge recessed the trial and requested a copy of the transcript from the court reporter.
Additional pre-trial proceedings took place on February 25, 1987 with respect to a subpoena issued at the request of a codefendant to the Superintendent of the State Police for the production of certain documents and records. The Attorney General[2] and the State Commission of Investigation had moved to quash the subpoena, in part based on lack of relevance and materiality. The judge reserved decision and gave the Deputy Attorney General until the next day to prepare affidavits concerning the difficulty of retrieving the information requested. DeMarco interjected "[h]ow about testimony rather than an affidavit?" When the judge indicated that he would accept an affidavit, the following exchange occurred:
MR. DE MARCO: How about if we don't accept an affidavit? Maybe we want to cross-examine.
Could we have the name who's going to prepare the affidavit so we can issue a subpoena so we can question him? I think we have the right.
MR. CISZAK: I imagine I will prepare the affidavit based on the facts that were given to me.
MR. DE MARCO: Then it's no one's affidavit except his affidavit. We can't ask him questions because it's going to be double hearsay.
MR. PETRINA: I can't see how Mr. Ciszak is going to tell you he is going to prepare an affidavit. An affidavit is sworn testimony, in effect.
Is he going to tell whoever is giving this what he's going to say? That person is suppose to say it, Judge.
MR. CISZAK: Hopefully counsel doesn't think that the Court is so ignorant to think that every client prepares his own affidavit and the attorney just allows him to put it in the proper form obviously for our clients. And every person who made it out of law school knows that.
MR. DE MARCO: I understood it was going to be your affidavit.
MR. CISZAK: I said I'll prepare it.
MR. DE MARCO: You're not going to sign it?
MR. CISZAK: Of course not.
MR. DE MARCO: Can you tell us whose affidavit it's going to be?
MR. CISZAK: I imagine the person who signs it.
MR. DE MARCO: I would like to know the person so I can subpoena him.
I mean Mr. Ciszak thinks this is funny. It's not funny to us.

*113 Since December 1 we tried to pick a jury. I would like to continue it.
Can we find out whose affidavit it's going to be?
THE COURT: I'm sure Mr. Ciszak doesn't think these proceedings are "funny".
MR. PETRINA: He's laughing.
THE COURT: All right. Let's proceed.
MR. DE MARCO: He's somebody from the State, it's got to be, right?
THE COURT: I'm going to take drastic action, I'm warning counsel, I'm going to take drastic action if counsel don't behave in these proceedings.
MR. DE MARCO: Is the Court threatening me? Are you threatening me, Judge? Is that a threat?
THE COURT: Let's proceed.
MR. DE MARCO: Is it a threat to me?
THE COURT: Mr. DeMarco.
MR. DE MARCO: Are you threatening me?
THE COURT: Mr. DeMarco, not a further word from you.
MR. DE MARCO: There will be further words from me in defense of my client.
There's not a judge nor a man who would quiet me in a courtroom when I'm defending a client.
THE COURT: You constantly demean the Court.
MR. DE MARCO: I demeaned you?
I think the State has served to demean you throughout these entire proceedings.
After some additional discussion about when the affidavits could be available, DeMarco informed the court that he would not be satisfied with an affidavit, but rather wanted a subpoena for the two individuals and persistently asked why they could not be brought in. The judge determined that they would meet at 11 a.m. and work through the lunch hour to accommodate DeMarco and Afflito. DeMarco replied "you're not accommodating me at all, you're accommodating an order from Judge Bissel, not me."[3]
DeMarco again requested the names of the individuals and when the Deputy Attorney General replied he was not sure who they would be, the judge determined that it would respond to *114 defense counsel's request the next day. DeMarco then remarked:
Another waste of time. So when I get the names, then I'll waste more time by issuing a subpoena and we'll have to wait until they come.
Your Honor, talking about dancing to the tune. You are dancing to the tune of the State. I can't believe an Attorney General comes in here and tells you I'm going to submit an affidavit of two people tomorrow, but I'm not going to give up their names and you're going to sustain that.
That record is going to look beautiful when someone sees that, it looks beautiful.
I have nothing further, Judge.
Thank you for the justice today.
The next day, February 26, 1987, the judge found that DeMarco's statements to the court constituted contempt of court under R. 1:10-1. An order was entered to this effect on March 6, 1987 and recited that a hearing regarding the penalty would take place upon conclusion of the trial of State v. Mancinelli, the underlying proceeding. The order specifically found the following quoted statements contumacious and attached copies of the transcript page to the order:
(1) `HE'S SOMEBODY FROM THE STATE, IT'S GOT TO BE, RIGHT?' (See attached transcript page 81, lines 22-23) [footnote omitted];
(2) `YOUR HONOR, ..., YOU ARE DANCING TO THE TUNE OF THE STATE.' (See attached transcript  page 93, line 11).
(3) `THANK YOU FOR THE JUSTICE TODAY.' (See attached transcript  page 93, line 20).
According to a newspaper article in The Record of March 26, DeMarco was reported as saying to a staff reporter on March 23, the final day of trial:
This genius we have on the bench couldn't give the right charge on conspiracy. He doesn't know the law of conspiracy, but he expects 12 laymen to know.
On March 25, 1987 DeMarco was ordered to show cause on April 1, 1987 why he should not be held in contempt for his conduct on December 15, 1986 and his March 23 statement to the reporter.
On April 1, 1987, apparently after the trial was concluded, the judge rejected DeMarco's request for additional time to obtain portions of the transcripts. On April 1, 1987 the court conducted the summary contempt proceedings. The statements made *115 to the court on December 15, 1986 were found to constitute contempt under R. 1:10-1. A fine of $500 was imposed with respect to that offense. In addition, the judge gave DeMarco an opportunity to address the March 6, 1987 contempt order relative to the February 25 incident. The judge reaffirmed the contempt finding in that order and imposed a $500 penalty. A judgment of contempt was entered on April 3, 1987. Payment of the fines was stayed pending determination of this appeal.
The matter of the statement of March 23 to the newspaper reporter was treated as a separate and independent matter and was referred to the Office of Attorney Ethics in Trenton for action. Although the judge could have alternatively instituted R. 1:10-2 proceedings, he expressly did not rule on that matter, and as neither that statement nor the referral is the subject of the Notice of Appeal[4] we do not pass upon DeMarco's contentions concerning the statement assertedly made to the newspaper reporter on March 23, and the subsequent publication thereof in the newspaper of March 26. The judge did not make a contempt finding with respect to that statement or consider it in his adjudication. He referred it to the Office of Attorney Ethics which presumably is acting thereon.
DeMarco argues that the judge should not have proceeded in a summary manner, and that his rights were violated when the judge proceeded under R. 1:10-1 which provides:
Contempt in the actual presence of a judge may be adjudged summarily by the judge without notice or order to show cause. The order of contempt shall recite the facts and contain a certification by the judge that he saw or heard the conduct constituting the contempt.
When a contempt is committed in the presence of the judge, he may act summarily without notice or order to show cause. In re Yengo, 84 N.J. 111, 121 (1980), cert. den. 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981). See also Cooke v. United States, 267 U.S. 517, 534-536, 45 S.Ct. 390, 394-395, 69 *116 L.Ed. 767, 773 (1925); State v. Vasky, 203 N.J. Super. 91, 98 (App.Div. 1985); In re Hinsinger, 180 N.J. Super. 491, 495 (App. Div. 1981). Notice and an order to show cause are only required when the proceedings are under R. 1:10-2. When the proceedings are under R. 1:10-1, the judge "may act upon his own knowledge of the facts," In re Contempt of Ungar, 160 N.J. Super. 322, 332 (App.Div. 1978), however the "contemnor's right to be heard includes the right to present `proof of material facts, if any, of which the court may be unaware.'" Id. (quoting In re Carton, 48 N.J. 9, 21, 222 A.2d 92 (1966)).
Contempt has been defined as:
... a disobedience of the court by acting in opposition to its authority, justice and dignity. It comprehends any act which is calculated to or tends to embarass, hinder, impede, frustrate or obstruct the court in the administration of justice, or which is calculated to or has the effect of lessening its authority or its dignity; or which interferes with or prejudices parties during the course of litigation, or which otherwise tends to bring the authority and administration of the law into disrepute or disregard. In short, any conduct is contemptible which bespeaks of scorn or disdain for a court or its authority. [Citations omitted]. [In re Callan, 122 N.J. Super. 479, 494 (Ch.Div. 1973), aff'd 126 N.J. Super. 103 (App.Div. 1973), rev'd on other grounds 66 N.J. 401 (1975)].
Contempt in the face of the court is direct contempt. In re Yengo, supra, 84 N.J. at 123.
The essence of a direct contempt, or contempt in the face of the court, is conduct that the judge can determine through his own senses is offensive and that tends to obstruct the administration of justice. [Citation omitted]. Generally, a disruptive act in the presence of the court, such as the use of offensive words or conduct, is a direct contempt. [Citation omitted]. [Ibid.]
As noted in Yengo, even an act not committed in the presence of the court may be a direct contempt. Id. The contempts here were direct contempts cognizable by the judge under R. 1:10-1, hence there was no necessity for notice or an order to show cause.
A judge may act summarily where the contemptuous conduct occurred in his immediate presence, was personally witnessed or heard by him and created "an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public." Cooke v. United States, supra, 267 U.S. at 536, 45 S.Ct. at 394, 69 L.Ed. *117 at 773. See State v. Vasky, supra, 203 N.J. Super. at 98; In re Hinsinger, supra, 180 N.J. Super. at 495. As cogently stated by Justice Handler in his concurring opinion in In re Yengo:
It has long been recognized that there are occasions when this inherent authority must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures.... The summary contempt power is integrally related to judicial self-preservation.... `The sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary not be frustrated....' This judicial `power is as ancient as the courts to which it is attached and "as ancient as any other part of the common law."' ...
The summary contempt power operates upon contemptuous conduct occurring `in the actual presence of a judge.' R. 1:10-1. New Jersey courts have treated the question of what constitutes a contempt in the `actual presence of the court' primarily in terms of the capacity of such conduct to undermine the court's authority and to interfere with or obstruct the orderly administration of justice. [Citations omitted]. [84 N.J. at 130-131].
DeMarco's procedural argument is that despite the judge's statements that he intended to proceed on the basis of a summary contempt under R. 1:10-1, the delay in adjudication of the penalty until the close of the trial, and the alleged consideration by the judge of matters other than the statements made in open court,[5] somehow converted the matter into a R. 1:10-2 proceeding. He further argues procedurally that he should have been allowed time to obtain transcripts of the relevant portions of the testimony. Dealing with the latter aspect first, we note that on several occasions the judge provided copies of the relevant pages of the transcript, although it was not necessary that this be done.
Moreover, we note that despite the lack of additional transcript pages, DeMarco's counsel at the hearing before the trial judge argued at length as to the surrounding circumstances at the time of his conduct. Counsel sought to justify DeMarco's statements in light of what had occurred. DeMarco neither alleges nor asserts any specific language in the transcripts *118 which in any way would affect the determination below or here. He fails to articulate in his brief how an adjournment would have benefited him in any fashion, other than by way of a mere generalization. There is no indication in the record that DeMarco was prejudiced in any fashion. He was aware that a hearing would be scheduled at the close of the criminal proceeding and was therefore free to obtain the transcripts during the ensuing weeks. He knew of the first instance on December 15, 1986. Likewise, he was given verbal notice on February 25, 1987 with respect to what had transpired on that date and written notice in the order. An order adjudicating his contempt had been entered on March 6, 1987, with the penalty aspect deferred. DeMarco apparently chose to do nothing from February 25 either until the date the order to show cause was entered or received, or even until the hearing date regarding obtaining the few additional transcript pages involved. In any event, there was no factual discrepancy and counsel was able to argue the issue thoroughly without additional transcript pages. Our thorough review of the transcripts does not demonstrate any basis for challenging the judge's determination. Indeed, the delay in the proceedings was partially as a result of counsel's argument and request.
We also note that such a delay does not automatically convert the proceeding into one requiring a hearing before another judge and the formalities under R. 1:10-2. See Kerr S.S. Co., Inc. v. Westhoff, 215 N.J. Super. 301, 305 (App.Div. 1987).[6] Here, it is obvious that DeMarco's words were spoken *119 in the presence of the judge on December 15, 1986 and February 25, 1987 and directed at him. No further evidence was needed for the judge to certify to his observations of that contumacious behavior. It is evident from the record that the statements of attorney DeMarco, who is expected to act as an officer of the court, were directed at the court, and contrary to his contention not in response to or directed at other attorneys in the case. This clearly resulted in a disruption of the proceedings by the use of improper or offensive words or conduct directed at the judge and constituted direct contempt. State v. Gonzalez, 134 N.J. Super. 472, 475 (App.Div. 1975), mod. on other grounds 69 N.J. 937 (1975). Cf. In re McAlevy, 69 N.J. 349, 351-352 (1976).
Nor does the claim that other matters were considered on April 1 have any merit. The judge made it clear that he would not consider or base his ruling on such matters. He specifically stated that the contumacious conduct consisted of DeMarco's statements to him and that he was only considering those statements. References in the March 6 and March 25, 1987 orders were made to those remarks and the order included transcript quotations and page references to the copies annexed.
The incidents involved were relatively recent and uncomplicated and treated virtually contemporaneously. DeMarco's presentation was not inhibited. He was not precluded from offering an explanation of his conduct. He could even have had the court reporter read back the few pages of transcript that were involved. This certainly would not have been difficult because the sections had already been marked and transcriptions made by the court recorder at the judge's request. The judge here properly relied on his observation of what happened in the courtroom and what was said. There was no requirement to transfer the matter to another judge. Furthermore, counsel's disagreement with the judge's characterization of the proceedings does not change an R. 1:10-1 proceeding into an R. 1:10-2 *120 proceeding. See Matter of Daniels, 219 N.J. Super. 550, 580-581 (App.Div. 1987), certif. granted 109 N.J. 496 (1987).
In summary, denial of DeMarco's request for an opportunity to obtain more complete copies of the transcripts was not a denial of due process of law. There is, of course, under the court's power to punish directly a diminishing of the "procedural due process accorded to the alleged contemnor." In re Yengo, supra, 84 N.J. at 122. Here, however, the judge below, as well as DeMarco, was fully aware of all of the material facts. Appropriate arguments concerning his state of mind could be made, and indeed were made. DeMarco had adequate notice. There was no need to further adjourn the hearing until additional transcript pages were obtained or could be obtained. No sufficient reason is even shown why the limited portions of the transcript that might have been necessary could not have been speedily obtained either during the trial or between the time that the February 25, 1987 order to show cause was signed and the April 1, hearing date.[7] It is clear from the record that DeMarco knew what he was doing, knew the consequences (on an earlier occasion he indeed twice challenged the judge to use his contempt authority if the judge thought he was being contumacious) and had sufficient recall as to what occurred.
DeMarco had a right to and received a hearing with the attendant right of allocution. See Taylor v. Hayes, 418 U.S. 488, 500, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897, 908 (1974); In re Yengo, supra, 84 N.J. at 122; In re Logan, 52 N.J. 475, 477 (1968); In re Kozlov, 156 N.J. Super. 316, 326 (App.Div. 1978), rev'd on other grounds 79 N.J. 232 (1979). Under our due process concepts it is also appropriate to allow the alleged *121 contemnor the right to be represented by an attorney, to retreat from his conduct, and to have the opportunity to correct misunderstandings on the part of the judge. In re Kozlov, supra, 156 N.J. Super. at 326. Hence, although in a direct contempt proceeding the judge is empowered to adjudicate the contemnor's conduct immediately, procedural due process is satisfied by a hearing in which the alleged contemnor is given every opportunity to place his position before the trial judge before whom the conduct occurred. In re Yengo, supra, 84 N.J. at 127. The record clearly discloses that the judge informed DeMarco virtually immediately after each incident that a hearing as to his alleged contumacious conduct would be held. The statements that had been made and formed the basis of the hearing were those made by DeMarco to the judge. There was no factual disagreement as to what was said. The hearing was to determine whether the conduct was contumacious in light of the surrounding circumstances and whether the attorney had intended to commit contempt. Our review of the record satisfies us fully that the judge properly held the contempt proceedings under R. 1:10-1 as to those matters for which he had adjudicated DeMarco in contempt.
We now turn to DeMarco's substantive claim that his comments were not contumacious per se when reviewed in the context of the proceedings. DeMarco contends that in each incident which resulted in the two contempt citations on appeal, he was only engaging in a "dialogue" with the trial judge or responding to allegations by the prosecutor that he was making fraudulent assertions. Our review of the record amply demonstrates beyond a reasonable doubt that DeMarco exhibited a pattern of abusive and unwarranted behavior directed at the trial judge. His statements far exceeded the bounds of colloquy and constituted rude, uncalled for attacks upon the objectivity and integrity of the judge, thus disrupting the trial proceedings. See Cooke v. United States, supra, 267 U.S. at 536, 45 S.Ct. at 394, 69 L.Ed. at 773; Matter of Stanley, 102 *122 N.J. 244, 253 (1986); In re McAlevy, supra, 69 N.J. at 351-352; State v. Vasky, supra, 203 N.J. Super. at 98; State v. Gonzalez, supra, 134 N.J. Super. at 475. See also R.P.C. 3.5(c) and 8.4(a) and (d).[8] The conduct displayed by DeMarco here was hardly within the bounds of appropriate vigorous representation of a client expected of a lawyer in the presentation of a matter or trial of a case. See In re Vincenti, 92 N.J. 591, 602 (1983); In re Mezzacca, 67 N.J. 387, 389-390 (1975). As stated in In re Vincenti, "`[a]n attorney who exhibits the lack of civility, good manners and common courtesy here displayed tarnishes the entire image of what the bar stands for.'" 92 N.J. at 601 (quoting In re McAlevy, supra, 69 N.J. at 352). For instance, in the incident of December 15, at the pre-trial motion the judge obviously was trying to stop an argument between the prosecutor and DeMarco. The judge had requested the attorneys to conduct themselves properly and avoid strong language in referring to their adversaries. DeMarco was not satisfied with this and proceeded to charge the judge with being unfair and even characterized his adversary's statement to him as "more contemptuous" than his own statement to the judge. Even if another attorney made such a statement directed to the court (it was not directed at the court here) that does not excuse DeMarco's earlier remarks.
The judge's integrity was also unfairly attacked by DeMarco at the February 25, 1987 court proceeding. Apparently DeMarco was displeased with the fact that the court had not ruled along the lines that he requested. We have quoted earlier in this opinion the language used by counsel. But an adverse ruling is never cause for such conduct or statements by counsel, either directed at the court or to opposing counsel.
*123 Nor is such conduct justified either by belief of the contemnor that the judge's rulings or comments are provocative, or as a reaction to an asserted erroneous ruling. In re Contempt of Carton, supra, 48 N.J. at 18-19. As the Supreme Court commented in In re Vincenti, supra, 92 N.J. at 603, "[r]espect for and confidence in the judicial office are essential to the maintenance of any orderly system of justice." Our courts have determined that any act in opposition to or which tends to lessen or bring into disrepute the court's authority or dignity is punishable by contempt. State v. Gonzalez, supra, 134 N.J. Super. at 475. Disruptive conduct is punishable by contempt proceedings. Such actions as committed here by DeMarco, viewed objectively in the context of the proceedings were indeed contumacious. In re Vincenti, supra, 92 N.J. at 600-601.
We reject as meritless DeMarco's attempt to justify his rude attack on the trial judge as a reasonable reaction to statements by either the judge or the attorney who was representing the State. The remarks were obviously addressed to the judge. They demonstrated DeMarco's persistent pattern of disrespectful, insulting behavior which constituted neither appropriate advocacy nor heat-of-trial remarks.
The judge below acted with restraint and in an effort to preserve order. He was restrained in his actions and used his summary contempt power as a last resort, after repeated warnings which were ignored. See Com. of Pa. v. Local Union 542, Intern'l Union of Oper. Engrs., 552 F.2d 498, 514 (3d Cir.1977), cert. den. 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977). We find, in the exercise of our de novo jurisdiction that the attorney's actions impacted adversely on the authority of the court and constituted contempt. See In re Yengo, supra, 84 N.J. at 122.
Accordingly, the judgments of conviction are affirmed. The stays are vacated.
NOTES
[1] The significance of the reference to "crowd" is uncertain. The element of threat is not.
[2] The Passaic County Prosecutor's office was trying the criminal case.
[3] Apparently Judge Bissel had scheduled the two attorneys to appear before him at 2:30 p.m. the next day. In any event, DeMarco's entire attitude as reflected in the exchange was unprofessional. R.P.C. 3.5(c) and 8.4(a) and (d).
[4] Appellant failed to include a copy of his Notice of Appeal in his appendix. See R. 2:6-1(a)(6). The State submitted it in its appendix.
[5] This related to an incident for which he was not adjudged in contempt, see discussion, supra at page 110, and perhaps to the statement to the reporter which was referred to the Office of Attorney Ethics, discussed at page 115.
[6] There may indeed be benefits to all concerned by proceeding cautiously. Emotions are allowed to subside and the involved individuals can consider proceeding in a different fashion than previously attempted. Moreover, interference with the attorney's handling of the case for his client is minimized. In re Contempt of Ungar, 160 N.J. Super. 322, 333 (App.Div. 1978); see Taylor v. Hayes, 418 U.S. 488, 498-500, 94 S.Ct. 2697, 2703-2704, 41 L.Ed.2d 897, 907-908 (1974); Com. of Pa. v. Local Union, 542, Intern'l Union of Oper. Engrs., 552 F.2d 498, 513-514 (3d Cir.1977), cert. den. 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977).
[7] DeMarco argues that he received the order on February 27 and only had three days to prepare for the hearing. He apparently did not count the day of receipt (a Friday) or Saturday and Sunday. However, it is also clear that the attorney had been warned on the record on each of the earlier occasions, heard the judge order copies of the transcript and even received from the judge copies of certain portions of the transcript that the judge had ordered.
[8] Compare the former Disciplinary Rule 7-106(C)(6) which even in stronger language prohibited "undignified or discourteous conduct ... degrading to a tribunal."