581 A.2d 125

## IN THE MATTER OF THE NEGOTIATION OF A LABOR CONTRACT FOR THE EMPLOYEES OF THE SURROGATE.

Superior Court of New Jersey
Law Division

August 31, 1989.

*Michael J. Hogan,* Burlington County Solicitor for the Burlington County Board of Chosen Freeholders.

*Joseph F. Polino,* for Elton A. Conda, Surrogate of Burlington County.

## OPINION

HAINES, A.J.S.C.

This Opinion holds that the personnel staffing Surrogates' offices are subject to the authority of an Assignment Judge with respect to the negotiation of a labor contract. It concludes that interference with the exercise of that authority is a contempt "in the actual presence of a judge." It discusses the

procedures by which an Assignment Judge may enforce an Administrative Order.

On July 1, 1987 the Burlington County Assignment Judge, the Burlington County Board of Freeholders and the Communications Workers of America entered into a "Memorandum of Understanding". Among other things, the Memorandum provided:

> The Assignment Judge of Burlington County is the employer of all judicial employees in Burlington County. "Judicial employees" are identified as all employees working in the Burlington County Probation Department, *the Office of the Surrogate of Burlington County,* all Court clerks and file clerks working in the office of the Burlington County Clerk and all administrative and other employees on the Superior Court payroll. [emphasis supplied]

The Memorandum recognized the Communications Workers of America, Local 1044, as the exclusive negotiations representative of judicial employees. It also provided that separate employment contracts would be negotiated for judicial and non-judicial employees working in Burlington County commencing in the year 1989. Initial negotiations have honored this understanding. The Board of Freeholders has executed a contract covering non-judicial employees; the contract for judicial employees, including Surrogate's employees, remains at the negotiations stage.

On July 12, 1989, the Assignment Judge received a Memorandum from Charles T. Juliana, Clerk/Administrator of the Board of Freeholders advising in pertinent part as follows:

> The Surrogate has designated the Board of Chosen Freeholders to act in his behalf during negotiations with CWA Local 1044. As a result of this designation, commensurate with the signing of the Agreement, employees of the Surrogate will receive compensation in compliance with the Agreement.

Attached to the Memorandum was a copy of a second Memorandum, executed by the Surrogate and dated July 12, 1989, which said, in part: "I hereby authorize the Board of Chosen Freeholders to be the bargaining agent for my employees." It is understood that the Surrogate relied on *N.J.S.A.* 2A:5–16 as authority for his action. That statute purports to give him authority to engage employees and to recommend their compensation.

The Juliana Memorandum crossed in the mail with one from the Assignment Judge, also dated July 12, 1989, which memorialized the Assignment Judge's understanding that employees of the Surrogate's office are judicial employees to be covered by a separate employment contract. This Memorandum was sent to the Clerk/Administrator and the Surrogate. It stated in part:

> I cannot consent to any arrangement which places any group of judicial employees under a contract separate from the contract to be executed on behalf of other judicial employees and will insist upon compliance with my legal and contractual understanding.

On July 14, 1989, the Assignment Judge responded in writing to the Clerk/Administrator's Memorandum of July 12, 1989, briefly explaining the applicable law and advising him "clearly and immediately of my opposition to the indicated arrangement." An Administrative Order executed by the Assignment Judge was attached. That Order provided that no further action was to be taken by the Board of Freeholders in furtherance of its intention to subject personnel of the Surrogate's Office to the labor contract covering non-judicial employees. It authorized the Freeholders to move to set aside the Order on two days' notice and stated that, in the event they so moved, they would be provided with a hearing.

The Freeholders did not make that motion. Later, the Assignment Judge was advised by the County Solicitor, in response to an inquiry, that the Board of Freeholders intended to treat the personnel of the Surrogate's Office as employees covered by the non-judicial contract of employment and intended to pay them under that contract the following day. The Assignment Judge therefore issued an Order to Show Cause why the Freeholders and the Surrogate should not be held in contempt.

It then appeared that the Freeholders were uncertain as to the restraining effect of the Order to Show Cause. Consequently, an additional Order was executed specifically restraining the Freeholders "from taking any action which will violate the Administrative Order of this court including in particular

the issuance of any checks to employees in the Surrogate's Office reflecting any compensation set forth in any contract governing non-judicial employees." The Freeholders agreed to honor that Order and the August 3rd hearing was postponed to August 28, 1989.

On August 16, 1989, the Assignment Judge ordered the Surrogate, through his attorney, to advise the Board of Freeholders that: (1) He recognized the fact the personnel of his office as judicial employees, and (2) agreed with the Assignment Judge that they were to be included in the contract covering judicial employees. A copy of that Order was sent to the attorney for the Board of Freeholders with a letter requesting the Board "once more to advise me that it will honor my Administrative Order and its own Memorandum of Understanding. If that is done, I will discontinue my contempt and injunctive proceedings insofar as the Freeholders are concerned." A certification of the facts upon which the contempt proceedings were based and a legal memorandum setting forth the law upon which the court relied were sent to counsel for the Board and counsel for the Surrogate at the same time.

On August 22, 1989, the Surrogate advised the Board of Chosen Freeholders by letter as follows:

° Upon order of the Assignment Judge of Burlington County, in my capacity as Surrogate of Burlington County, I have been directed to advise you and the Surrogate recognizes that:

    1. The employees of the Surrogate's Office are judicial employees; and

    2. Are to be included in the employees' contract now under negotiation for judicial employees.

On August 23, 1989, the solicitor for the County of Burlington wrote a letter to the Assignment Judge stating:

I am writing to inform you that the Board of Chosen Freeholders at its conference meeting of August 23, 1989 determined that it will honor the Administrative Order issued by you on July 14, 1989. This determination is without prejudice to the Board of Freeholders and reserves to the Board of Freeholders all legal rights provided to it under the law.

On receipt of the letter from the solicitor, the Assignment Judge advised him that the contempt charges against the Board

would be dropped and that the Freeholders were not required to appear before him on August 28, 1989.

On that date the contempt hearing proceeded. The court announced that the Freeholders had purged themselves of any contempt charged against them. The Surrogate was advised that the court would consider any testimony, exhibits and argument that he wished to present. Certain documents, including the Assignment Judge's certification of facts and all correspondence, Orders and memoranda exchanged by the parties, together with certain documents offered by the Surrogate were marked into evidence. The Surrogate testified briefly, stating that he had never intended to act in any way which would constitute a contempt of court. He said that the actions taken by him were based upon his belief that statutory authority took precedence over the authority exercised by the Assignment Judge. Argument was presented by his attorney who was permitted to file a post-hearing brief. This Opinion addresses and resolves the various issues raised in the proceedings.

I. Identification of Judicial Employees.

█ The Memorandum of Understanding of July 1, 1987 identified the judicial employees of the Burlington County Assignment Judge. It included among them, specifically, the personnel of the Surrogate's Office. Prior to 1989, the County's employment contracts did not distinguish between judicial and non-judicial employees. They did, however, recognize the authority of the Assignment Judge over judicial employees by providing them with a grievance procedure ultimately reaching to the office of that Judge.

The New Jersey Supreme Court recognized Surrogate's personnel as judicial employees in *In re Conda,* 72 *N.J.* 229, 370 *A.*2d 16 (1977) saying:

R. 1:17–1 prohibits political activity on the part of certain enumerated officers and employees serving the judicial branch of government. This includes deputy

surrogates and all persons employed by or regularly assigned to a Surrogate's Office. [at 235–236, 370 *A.*2d 16]

Common sense, of course, leads to the same conclusion. The work of the personnel of the Surrogate's Office, as well as the work of the Surrogate himself, is entirely judicial.

## II. The Authority of the Assignment Judge Over Judicial Employees.

### A. *Authority over judicial employees in general.*

The Rules governing the courts of the State of New Jersey, pursuant to the New Jersey Constitution, provide that "[t]he Chief Justice of the Supreme Court shall be responsible for the administration of all courts in the State." *R.* 1:33–1. He is assisted in the vicinages by the Assignment Judges to whom our Rules of Court delegate administrative authority. Thus, *R.* 1:33–4 provides in part:

(a) The Assignment Judge shall be the chief judicial officer within the vicinage and shall have plenary responsibility for the administration of all courts therein, subject to the direction of the Chief Justice and by rule of the Supreme Court. He shall be responsible for the implementation and enforcement of the rules, policies and directives of the Supreme Court, the Chief Justice and the Administrative Director.

(b) The Assignment Judge shall be the authorized representative of the Chief Justice for the efficient and economic management of all courts within the vicinage. His responsibilities also shall include all such matters affecting county and municipal governments, including but not limited to budgets, personnel and facilities.

(c) The Assignment Judge shall be responsible for the supervision and efficient management of all court matters filed in the vicinage and for the supervision, superintendence and allocation of all judges and personnel having a judicial support function within the vicinage.

(d) The Assignment Judge shall have full responsibility for the administration of all court units within the vicinage, including those of the Surrogate and the deputy clerk of the Superior Court.

(e) Subject to uniform minimum standards and conditions promulgated by the Administrative Director, the Assignment Judge may appoint and discharge such judicial support personnel within the vicinage as he shall deem necessary. [emphasis supplied]

The authority of the Assignment Judge over vicinage personnel was underlined in *In re Court Reorganization Plan of*

*Hudson County,* 161 *N.J.Super.* 483, 391 *A.*2d 1255 (App.Div. 1978), aff'd *o.b.* 78 *N.J.* 498, 396 *A.*2d 1144 (1979), in which the court said:

> The power of the assignment judge to select and assign as his assistants those who satisfy his needs from the coterie of county employees stems from the inherent power of the courts as implemented by *R.* 1:33–3(b) [now *R.* 1:33–4]. And although these assistants may remain county employees for the purpose of payment of their remuneration, they nevertheless serve under the control and direction of the assignment judge in the unclassified category and at his pleasure. Similarly, although the financial burdens related to their positions are imposed on the county, nevertheless the assignment judge has the inherent power when necessary to fix their salaries. Such a hybrid status is not unusual under our county government structures. [161 *N.J.Super.* at 493, 391 *A.*2d 1255]

In *Passaic Cty. Probation Officers' Ass'n. v. Cty. of Passaic,* 73 *N.J.* 247, 374 *A.*2d 449 (1977), the Supreme Court said:

> It accordingly seems that probation officers play an important and indeed vital role in the administration of justice, both in the criminal and civil courts, throughout the State. It follows that as an integral part of the court system, they necessarily come within the regulatory control and superintendence of this court. [at 253, 374 *A.*2d 449]

In *Camden Cty. Freeholder Bd. v. Camden Cty. Clerk,* 193 *N.J.Super.* 100, 472 *A.*2d 178 (Law Div.1983), aff'd 193 *N.J.Super.* 111, 472 *A.*2d 184 (App.Div.1983), involving a budget directive, the court said that the New Jersey Constitution empowers the Supreme Court "to compel the appropriation of funds and the employment of personnel necessary for the efficient administration of justice." [193 *N.J.Super.* at 105, 472 *A.*2d 178]

The law, as set forth in our rules of court and our judicial decisions, is very clear: judicial personnel are employees of the Assignment Judge acting on behalf of the Chief Justice. Consequently, they are to be subjected only to such employment contracts as are negotiated for them by the Assignment Judge and are not to be included in contracts covering non-judicial employees.

B. *The authority of the Assignment Judge over the Surrogate.*

In *In re Conda,* the Supreme Court said:

> It is thus apparent that the surrogate is a judicial officer performing important judicial functions in our court system. From that standpoint it is appropriate and in accord with sound public policy that he be held to be a judge, and subject both to the administrative oversight of the Chief Justice and the Supreme Court.... [72 *N.J.* at 234, 370 *A.*2d 16]

Since the Chief Justice, pursuant to *R.* 1:33–4, exercises his administrative oversight responsibility through the Assignment Judges, it is their commands to which the Surrogate must respond.

III. Procedure—The Exercise of the Assignment Judge's Authority.

In the present case, the Assignment Judge has directed three Orders to the Board of Freeholders and two Orders to the Surrogate. The first was an Administrative Order addressed to the Freeholders prohibiting the subjection of the Surrogate's personnel to the contract covering non-judicial employees. It reflected the exercise of the administrative authority of the Assignment Judge. The next two Orders were judicial Orders, an Order to Show Cause why the Freeholders and the Surrogate should not be held in contempt and an Order restraining the Freeholders from issuing checks to Surrogate's personnel in an attempt to exclude them from the contract under negotiation for judicial employees. The last Order directed the Surrogate to advise the Freeholders that he agreed with the position of the Assignment Judge. The Orders were preceded by memoranda clearly spelling out the factual and legal contentions of the Assignment Judge. They are all that was required for the exercise of his constitutional, inherent and delegated authority over the operation of the court system and its personnel. The initial Administrative Order, followed by judicial Orders designed for its enforcement, represent a natural and orderly exercise of the commingled administrative-judicial powers of an Assignment Judge.

A brief discussion of the effect of administrative and judicial orders is appropriate.

## A. *Administrative Orders.*

Administrative Orders are final Orders having the effect of final judgments. They are appealable to the Appellate Division and the Supreme Court. In *In re Court Reorganization Plan of Hudson Cty.*, the Assignment Judge issued 16 administrative orders designating personnel to be his assistants. The administrative orders themselves formed the basis of an appeal to the Appellate Division. That court noted that the Assignment Judge had proceeded by Order to Show Cause, thus providing a hearing to the Board of Freeholders which, while in the public interest, was unnecessary. It held that the Assignment Judge was acting in a purely administrative capacity and was not, by reason of any due process requirement, obliged to disqualify himself from hearing the matter. [161 *N.J.Super.* at 488–489, 391 *A.*2d 1255]

In *In re John Brennan*, 126 *N.J.Super.* 368, 314 *A.*2d 610 (App.Div.1974), the employment of Brennan, a District Court employee, was terminated because he had attained age 70. The termination was effected by the Assignment Judge at the conclusion of a hearing held after issuance of an Order to Show Cause. Brennan appealed from that Administrative Order to the Appellate Division. No objection was made to the procedure.

The effect of an Administrative Order is little different than the effect of an Order made by a judge acting as a legislative agent, namely, the effect of a final judgment, binding upon the person to whom it is directed. Orders of judges acting as legislative agents are appealable. *In re Application of Bigley*, 55 *N.J.* 53, 56, 259 *A.*2d 213 (1969) (involving a legislative agent's order to a Board of Freeholders).

## B. *Judicial Orders.*

The Burlington County Board of Freeholders did not appeal the Assignment Judge's Administrative Order. It ignored it. Enforcement of the Order therefore became necessary. The

enforcement vehicle was the Order to Show Cause, accompanied by a Restraining Order. The Order to Show Cause was plenary process, typical of contempt proceedings, even summary proceedings, which are employed when the contempt charged is a contempt *in facie curiae* (in the face of the court). See, for example, *In re Mattera*, 34 *N.J.* 259, 168 *A.*2d 38 (1961) (concerning a "ticket fixing" charge against a magistrate), in which the court commenced a summary contempt proceeding by issuing an order to show cause.

C. *The Rights of Defendants in Summary Contempt Proceedings.*

■ The instant proceedings are summary, commenced by the Assignment Judge who expects to hear and decide the issues. This is permissible when, as alleged here, the contempt is committed in the actual presence of the Judge. *R.* 1:10–1. In such cases an immediate Order reciting the facts and adjudging the guilt of the offender may be entered. *In re Contempt of Carton*, 48 *N.J.* 9, 222 *A.*2d 92 (1966), describes the rights of a defendant in such a proceeding:

> *R.* 4:87–1 [now *R.* 1:10–1] deals with an offense committed in the presence of the court and permits the immediate entry of an order reciting the facts and adjudging the offender guilty of contempt. This short procedure may be used, as the Rule says "only if the Judge certifies by Order that he saw or heard the conduct constituting the contempt and that it was committed in his actual presence." This authority to deal *instanter* with an offense so committed arises from necessity, to support the judge's control of the courtroom. And since the judge knows of the offense by his own senses, he need not induce proof of the wrong, but may merely certify the facts he witnessed in the order of conviction. The defendant's right to be heard is limited to the proof of material facts, if any, of which the court may be unaware, to the legal evaluation of the facts, and to punishment. [at 21, 222 *A.*2d 92]

Additional rights are described in *In re DeMarco*, 224 *N.J.Super.* 105, 539 *A.*2d 1230 (App.Div.1988):

> Under our due process concept it is also appropriate to allow the alleged contemnor the right to be represented by an attorney, to retreat from his conduct, and to have the opportunity to correct misunderstandings on the part of the judge. [at 120–121, 539 *A.*2d 1230]

■ The entry of an immediate order is not necessary. In *Kerr S.S. Co., Inc. v. Westhoff,* 204 *N.J.Super.* 300, 498 *A.*2d 793 (Law Div.1985), aff'd 215 *N.J.Super.* 301, 521 *A.*2d 1298 (App.Div.1987), several months elapsed between the date of the occurrence and the date of the contempt decision. In *Mattera* much time must have passed between the date the order to show cause was issued and the date the contempt question was decided by the Supreme Court. See also, *State v. Gale,* 226 *N.J.Super.* 699, 545 *A.*2d 279 (Law Div.1988).

IV.  Contempt in the Actual Presence of the Court.

A contempt of court has been defined as a disobedience to the court by acting in opposition to its authority, justice and dignity. Generally speaking, he whose conduct tends to bring the authority and administration of the law into disrepute or disregard, interferes with or prejudices parties during litigation, or otherwise tends to impede, embarrass or obstruct the court in the discharge of its duties is guilty of contempt. *In re Bozorth,* 38 *N.J.Super.* 184, 188, 118 *A.*2d 430 (Chan.Div.1955).

"All superior courts of record, civil and criminal, possess this [contempt] power inherently and independent of statutory authority." *In re Merrill,* 88 *N.J.Eq.* 261, 267, 102 *A.* 400 (Prerog.Ct.1917). Use of this inherent power in a summary proceeding may be a necessity. Thus, in *In re Mattera,* 34 *N.J.* at 273, 168 *A.*2d 38, the court noted that "there may be an overriding necessity to stop at once a course of behavior which contaminates the judicial process." The Legislature has recognized the power. In *N.J.S.A.* 2A:10-1 it provided that the power of a court to punish for contempt extends to the disobedience of any "lawful ... order, or command of the court."

■ Contempts may be direct (*in facie curiae*) or indirect. It is the position of the Assignment Judge in the present case that the alleged contempts are direct, a conclusion which permits him to decide the matter after conducting a summary hearing. That position is supported by adequate authority.

*R.* 1:10-1 provides for summary proceedings in contempt cases. It states:

> Contempt in the *actual presence* of a judge may be adjudged summarily by the judge without notice or order to show cause. The order of contempt shall recite the facts and contain a certification by the judge that he saw or heard the conduct constituting the contempt. (emphasis supplied.)

Many cases have held that contempts are *in facie curiae, i.e.* "in the actual presence of a judge", though not in the judge's *physical* presence, thus broadening the meaning of the words "actual presence". *In re Caruba,* 139 *N.J.Eq.* 404, 421, 51 *A.*2d 446 (Ch.1947), aff'd 140 *N.J.Eq.* 563, 55 *A.*2d 289 (E & A 1947), *cert.* den. 335 *U.S.* 846, 69 *S.Ct.* 69, 93 *L.Ed.* 396 (1948), held that a false swearing before a master and not a judge was a contempt of the Court of Chancery. It cited a number of cases holding that conduct which does not occur in the physical presence of a judge may nevertheless be a contempt *in facie curiae* and noted that:

> The court is present wherever any of its constituent parts is engaged in the prosecution of the business of the court according to law. [139 *N.J.Eq.* at 422, 51 *A.*2d 446]

*State v. Sax,* 139 *N.J.Super.* 157, 353 *A.*2d 113 (App.Div.1976), held that a scurrilous letter to the clerk of a municipal court was a contempt in the face of that court. The filing of a scandalous brief was held to be *in facie curiae* in *In re Glauberman,* 107 *N.J.Eq.* 384, 152 *A.* 650 (E & A 1930). An assault upon an expected witness which occurred at a distance from the court house was also held to be such a contempt because of its tendency to interfere with and obstruct the due administration of justice. *In re Hand,* 89 *N.J.Eq.* 469, 105 *A.* 594 (Ch.1918). A threat made in the office of an attorney, designed to force him to stop defending a divorce case, was held to be a contempt *in facie curiae* because it tended to deprive the court of one of its solicitors and to permit a collusive divorce. *In re Bowers,* 89 *N.J.Eq.* 307, 104 *A.* 196 (Ch.1918).

*In re Yengo,* 84 *N.J.* 111, 417 *A.*2d 533 (1980), involved a summary contempt proceeding brought against a lawyer who had failed, without excuse, to appear for trial. His conviction by the trial judge was affirmed. However, the Supreme Court

held that the right to proceed summarily depended on the quality of the lawyer's excuse. Since Yengo's excuse was deemed to be "frivolous", the summary approach was approved. The Court nevertheless emphasized its preference for a non-summary proceeding, saying:

> If there is some evidence of the adequacy of the [lawyer's] explanation, the judge should characterize the matter as an indirect contempt and proceed by order to show cause returnable before another judge. *R.* 1:10-2, -4. The semblance of adequacy dilutes the offensiveness of the explanation and diminishes the need for dealing instantly with the offense. If the proffered explanation may require proof of facts occurring outside the presence of the court, the better practice is to proceed before another judge. [at 127]

Justice Handler wrote a concurring opinion in which two other Justices joined. He disagreed that any need for a reference to a different judge existed and, in doing so, explained the meaning of the words "in the actual presence of a judge":

> The summary contempt power operates upon contemptuous conduct occurring "in the actual presence of a judge." *R.* 1:10-1. New Jersey courts have treated the question of what constitutes a contempt in the "actual presence of the court" primarily in terms of the capacity of such conduct to undermine the court's authority and to interfere with or obstruct the orderly administration of justice. *In re Caruba, supra,* 139 *N.J.Eq.* at 411 [51 *A.*2d 446]. Ordinarily, contempts of this nature occur directly to and before the judge; hence, the terms "direct contempt" and "contempts *in facie curiae*" are generally used interchangeably. *Id.* at 423 [51 *A.*2d 446]. Our courts, however, have never imposed as a prerequisite for a "direct contempt" that every facet of the contemptuous conduct or each element of proof of the contempt be based upon evidential matters occurring only in the actual presence of the judge. To that extent, I disagree with the contrary suggestion of the court. [at 131]

*Yengo* involved a lawyer's inexcusable failure to appear for trial. The facts here are very different and more compelling. They involve the knowing, unacceptable flaunting of an Assignment Judge's authority, thus directly interfering with his conduct of the business of the courts. It is likely that the Supreme Court, on these facts, would find the conclusion of the concurring Justices most fitting.

■ That speculation, however, is unnecessary here. Present circumstances met the test of the *Yengo* majority. That test permitted the Assignment Judge to hear the matter provided (1) he knew by his own senses all of the facts consti-

tuting the contempt, and (2) the act was one which impacted adversely on the court's authority. [84 *N.J.* at 121–122, 417 *A.*2d 533] Here, all of the proofs necessary to show that the offenses occurred were contained in the memoranda, orders, responses and non-responses occurring in the course of exchanges involving the Assignment Judge himself. He knew, by his own senses, all of the facts constituting the offense. The circumstances, while more elaborate, are not unlike those in *Sax* in which the judge proceeded summarily on the basis of a letter sent to his clerk. Obviously, the action of the Freeholders and the Surrogate impacted adversely on the authority of the court.

## V. The Surrogate.

*In re Conda* held that "the surrogate is a judicial officer performing important judicial functions in our court system ... subject both to the administrative oversight of the Chief Justice and the Supreme Court...." [72 *N.J.* at 234, 370 *A.*2d 16] The Supreme Court, in *In re Mattera* said: "There can be no doubt that a judge of an inferior court may be attached for disobedience of a direct Order of a superior court." 34 *N.J.* at 273, 168 *A.*2d 38. Thus, the Surrogate, by disobeying the Order of the Assignment Judge and by encouraging the Board of Freeholders to do the same, became a contemnor.

## VI. *N.J.S.A.* 2A:5–16.

This statute provides in pertinent part as follows:

The Surrogate of each county shall select and appoint the deputy surrogate, any special deputy surrogate, executive clerk or chief clerk and engage all other employees, who shall receive such compensation and shall be recommended by the surrogate and approved by the board of chosen freeholders of the county.

The Surrogate is of the opinion that this statute provides him with complete control over the employees of his office, control that authorized the actions which led to these proceedings.

The statute is of doubtful constitutionality. It regulates, or attempts to regulate, employees in a statewide judicial system

controlled by the Chief Justice acting through the Assignment Judge. If read as broadly as the Surrogate reads it, it is contradicted by *R.* 1:33–4(d), (e) which provides the Assignment Judge with authority to "appoint and discharge such judicial support personnel within the vicinage as he shall deem necessary." There is, however, no need to pass upon the constitutional question.

Ordinarily courts do not decide questions of constitutionality unless those decisions are necessary to the disposition of the issues involved in the litigation. *State v. Salerno,* 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958). In the present case the only question, apart from questions involving contempt proceedings, is whether the Assignment Judge has the authority to insist upon the inclusion of the employees of the Surrogate's office in a contract which covers only judicial employees. It is entirely clear that the Assignment Judge has that authority and that the statute upon which the Surrogate relies need not be read in a way which prevents its exercise. The statute does not declare that the Surrogate and his personnel are non-judicial employees. It does not require Surrogate's personnel to be included in a non-judicial employment contract. It does not give the Surrogate authority to designate a bargaining agent for his employees and certainly does not authorize him to disregard the Orders of the Assignment Judge, even if he disagrees with them. The authority of the Assignment Judge to deny the right of the Surrogate to engage employees and to recommend their compensation has not been drawn into question in this proceeding. Consequently, there is no need to address the constitutionality of *N.J.S.A.* 2A:5–16.

VII. Disposition of the Contempt Charges Against the Surrogate.

The Administrative Order of the Assignment Judge was not directed to the Surrogate himself although a copy was sent to him. Thus, as he argues, it cannot be said that he

violated that Order. Nevertheless, the Surrogate was well aware of the Order and of the legal and administrative position of the Assignment Judge with respect to his personnel. It was, therefore, entirely improper for him to appoint the Board of Freeholders as the bargaining agent for his employees with the obvious intention of having them included in a contract covering non-judicial employees. He had to know, in doing so, that he was interfering with the Assignment Judge's administrative control of the court system in Burlington County. Nevertheless, prior to the contempt hearing, he honored the Assignment Judge's last Order, advising the Freeholders that he agreed with the Judge's position. In addition, he advised the Assignment Judge, in the course of his testimony, that he intended no contempt. Finally, it cannot be denied that the statute upon which he based his actions provided him, arguably, with authority for taking those actions prior to the writing of this Opinion. For all of these reasons, it is the conclusion of this Court that Elton A. Conda, the Surrogate of Burlington County, has purged himself of all contempts charged against him in this matter. The Order to Show Cause issued to him is discharged.