IN THE MATTER OF DENNIS D.S. McALEVY, AN ATTORNEY AT LAW.

Argued June 16, 1983—Decided August 2, 1983.

*David E. Johnson, Jr.* argued the cause for complainant Disciplinary Review Board (*Collette A. Coolbaugh,* Secretary, attorney).

*Joseph A. Hayden, Jr.* argued the cause for respondent (*Shain, Hayden, Perle, Rafanello & Schaffer,* attorneys).

PER CURIAM.

This disciplinary proceeding involves two instances of attorney misconduct in the trial of criminal matters. The first involves failure to appear at a scheduled trial date in Hudson County; the second involves disruptive and insulting conduct during a criminal trial in Essex County. Each resulted in convictions of contempt under *R.* 1:10 and fines of $500 and $2500 respectively.

## I. (Essex Contempt)

Respondent, Dennis D.S. McAlevy, represented one of ten defendants in a multiple defendant gambling conspiracy trial. This trial has required our attention before.

> ... The nature of the case, the number of defendants and their counsel, together with the complexity of the evidence, presented difficult trial problems. The intricate proofs, which included wiretaps or monitored telephone conversations by court-authorized electronic surveillance, made attorney attendance throughout the trial a matter of highest priority. Both court and counsel recognized the special problems inherent in the management of the case. For example, 18, rather than 12, jurors were impaneled. The trial was estimated to last for five weeks. Those difficulties were compounded by an influenza epidemic and a major snowstorm. Because of bad weather, the scheduled trial date was postponed three times. [*In re Yengo,* 84 *N.J.* 111, 116 (1980), *cert.* den., 449 *U.S.* 1124, 101 *S.Ct.* 941, 67 *L.Ed.*2d 110 (1981)].

The trial, which began on February 21, 1978, was bitterly contested. The court, disturbed over the increasingly disruptive tactics of counsel, gave counsel fair warning that it would not tolerate further instances of misconduct.[1]

On April 28, 1978, following the five-week trial, the court issued an Order to Show Cause and Certification charging respondent with eight specifications of contemptuous conduct during the trial. The eight incidents were specifically alleged to have been part of "a continuous pattern of unprofessional conduct which was abusive and disrespectful of the Court, disruptive of the Court proceedings and prejudicial to the administration of justice."

The contempt proceedings were conducted by another judge in the county on July 6, 1978. Respondent pleaded guilty to four charges under a plea bargain and the court dismissed the remaining four charges. Respondent was fined a total of $2500. The essence of the charges to which respondent pleaded guilty is as follows (for convenience, they are listed alphabetically as they appear in the Certification):

(c) In response to the judge's sustaining of his objection to a question by the prosecutor on March 3, 1978, he exclaimed, "I cannot believe that." Although the judge ordered him to cease, his comments continued and when he was directed by the court to stop screaming he responded, "Let the record reflect that I am not the only one screaming."

---

[1] On March 6, 1978, the court said:

I will do whatever I can to see that I carry out my duties and responsibilities properly and I trust that you will carry out your duties and responsibilities properly so that the jurors in this courtroom and the public that sits in this courtroom do not think that this system of justice can be mocked in the way that it has been mocked in the past. We are in the halls of justice and if you and I and my court staff cannot act in a professional manner and conduct ourselves in a professional manner, then our system is in a very bad position.

So, I am just taking this time just to notify you of my deep concern with the lack of respect and the mockery that is being made of these proceedings by you and to indicate to you that I trust in the future that each of you will conduct yourself in an appropriate manner, and if you do not, then I want you to know that I will take the appropriate action.

(d) Respondent again made improper comments before the jury on March 3, 1978 when, after objecting to another of the prosecutor's questions he screamed in a loud voice, "He knows better than that." After a reprimand by the court, respondent again screamed "We don't need another mistake by the prosecutor." He then characterized the prosecutor's questions as being "deliberately misleading" and requested that the court instruct the prosecutor as to how to ask the questions. All of this occurred in open court before the jury, respondent never asking for a side bar conference.

(f) On March 8, 1978 at a side bar conference which resulted in a ruling adverse to the respondent, he accused the court in a loud voice of making "insulting remarks" to him in front of the jury. The court warned respondent not to ask improper questions of the witness but he continued to do so. The Court then called respondent to side bar and cited him for contempt. He left the bench after a heated exchange at side bar in a manner indicating disgust with the court and disrespect with its ruling. As respondent left side bar on his way toward the witness stand to resume cross-examination of the state's witness, the court heard him say "I can't believe this." These words were followed by profane, obscene utterances not heard by the judge, who was turning back from side bar to the bench, but heard by four other persons in the courtroom. The prosecutor who was walking immediately in back of McAlevy heard the respondent say, "I don't believe this _____ _____." One of the defense counsel seated close to the side bar swore he heard respondent state, "This _____ _____ has gotta be nuts." Apparently as respondent moved further past the counsel tables on his return to the witness stand area another defense counsel heard McAlevy exclaim, "She's _____ crazy." As demonstrated by Exhibit P–7, incorporated herein, as the respondent made these questionable remarks, he was actually approaching the witness and jurors, rather than returning to his seat at the opposite side of the courtroom. Indeed, a portion of his remarks were overheard by the prosecutor's investigator, who was at the prosecutor's table and closest to the jurors. He reported that he heard respondent say, "I don't believe this _____ ..." Thus, it appears that respondent made four separate obscene utterances, each one closer to the jury box than the last.[2]

(h) On March 14, 1978 while the jury was deliberating respondent was reprimanded by the judge for switching name plates at counsel table. As the Judge left the bench respondent in a loud and abusive manner said "Let the record reflect that the Judge is getting up and gaveling and walking off the bench." During these comments respondent referred to the court's attendant who had brought the incident to the judge's attention as a malicious person.

---

[2]Because the respondent denied the use of the specific language but admitted before us that the alleged words were obscene, repeating them in our opinion serves no useful purpose.

As noted, at the contempt hearing respondent pleaded guilty to all four of these charges but, as to specification (f), he was unwilling to concede the exact verbiage used.[3]

## II. (Hudson Contempt)

This conviction arose from respondent's failure to appear for the trial of several criminal matters on March 26, 1979. The respondent attended a January 29, 1979 calendar call as part of a crash program to dispose of very old criminal indictments in the county. At that time the Hudson County Assignment Judge specifically set down six of respondent's cases pending from 1974 and 1975 indictments for trial commencing Monday, March 26, 1979.

Respondent had been engaged in a forty-seven day trial that ended in early March and that taxed his office resources. On Wednesday, March 21, 1979, respondent was in Passaic County on a *Driver* hearing in a case pending in that county. He asserts that upon conclusion of that hearing he was directed to appear for trial in Passaic County also on Monday, March 26, 1979. He did not advise that court of his commitments in Hudson, nor did he call the Hudson judiciary to seek to resolve the calendar problem. He simply went to Passaic County and let the Hudson County cases wait. He arranged to have an attorney appear in Hudson County to handle *one* of the cases but did not arrange to have *that* defendant appear in court.

Respondent's citation for the Hudson contempt was tried before a Bergen County judge who had no involvement in either matter. After a plenary hearing, that court found respondent in contempt of court and fined him $500 for his failure to

---

[3]At the ethics hearing based upon this contempt an additional charge was made by reviving specification (g) of the original Certification, which alleged that on March 13, 1978 respondent and another attorney changed nameplates of one of the ten defendants and three of the ten attorneys while the jury was deliberating its verdict. Thereafter on March 14, 1978 the jury returned to the courtroom at its own request to again listen to a portion of tape recordings from the trial. During this period the nameplates remained in the improper positions. Respondent in his answer to this ethical charge admitted the underlying conduct but asserted that it was simply horseplay "done as a product of nervous tension" near the end of a long trial.

appear. The court concluded that respondent's "arrangement" to have a substituted attorney appear for the one defendant who would not be present for trial was "trifling with the court and a sham." It found respondent's attempt to explain this incident "incredible."

## III.

The two incidents resulted in separate complaints before the District Ethics Committee. That body, pursuant to stipulation, considered the matters on the basis of the records of the contempt proceedings and affidavits of other witnesses. The District Ethics Committee made a presentment on the Essex contempt but recommended dismissal of the Hudson contempt. The Division of Ethics and Professional Responsibility appealed the dismissal of the Hudson contempt. That appeal was granted and the Disciplinary Review Board heard the two matters together.

In February 1983, the Disciplinary Review Board issued a report and recommendation finding unethical conduct on the part of respondent. It found the contempt convictions to be conclusive evidence of respondent's professional misconduct, citing *In re Rosen,* 88 *N.J.* 1 (1981). It found that in both instances, respondent's conduct lacked the "[c]ommon courtesy and civility . . . expected from a member of the bar whether he appears before the State's highest court or presents a matter to some administrative body," *In re Mezzacca,* 67 *N.J.* 387, 390 (1975), and thereby violated various disciplinary rules. It recommended that respondent be severely and publicly reprimanded.

Our independent review of the entire record leads us to the conclusion that respondent has indeed been guilty of unethical conduct in the matters charged. However, while we attach considerable weight to the recommendation of the Disciplinary Review Board, it is our view that a three-month suspension appropriately reflects the seriousness of respondent's misconduct and will adequately protect the public.

## IV.

Recently, we emphasized the important role that lawyers play in the administration of justice.

> The prohibition of our Disciplinary Rules against "undignified or discourteous conduct * * * degrading to a tribunal," DR 7–106(C)(6), is not for the sake of the presiding judge but for the sake of the office he or she holds. Respect for and confidence in the judicial office are essential to the maintenance of any orderly system of justice. This is not to suggest that a lawyer should be other than vigorous, even persistent, in the presentation of a case; nor is it to overlook the reciprocal responsibility of courtesy and respect that the judge owes to the lawyer. Unless these respective obligations are scrupulously honored, a trial court will be inhibited in performing two essential tasks: sifting through conflicting versions of the facts to discover where the truth lies, and applying the correct legal principles to the facts as found. Under the best of circumstances these tasks are difficult; without an orderly environment they can be rendered impossible. [*In re Vincenti*, 92 *N.J.* 591, 603–04 (1983)].

We imposed sanctions there for "conduct so bizarre, so outrageous, as not to bring us close to what in some case might be the difficult problem of distinguishing between permissibly vigorous advocacy and an ethical transgression." *Id.* at 602.

We believe that both the District Ethics Committee and the Disciplinary Review Board were troubled by this aspect of drawing a line between forceful advocacy and disrespect for the court. Respondent's characterization of a court officer as "malicious" may appear innocuous in print. However, in the context of this trial, where co-counsel in a related incident obscenely insulted a court officer who asked that the lawyer return to the courtroom from a telephone booth, it bespeaks an underlying attitude of great concern to us. We insist that "lawyers display a courteous and respectful attitude not only towards the court but towards opposing counsel, parties in the case, witnesses, court officers [and] clerks...." *Vincenti*, 92 *N.J.* at 603.

The respondent denied the use of the specific words set forth in the citation for contempt although he admitted that whatever words were used have no place in a courtroom. Furthermore, it is not redeeming that the judge did not hear the comments made or the words used. It is one thing to talk to one's self but another to talk out loud during the course of a trial in the

presence of counsel, parties and jury. The court that heard the Essex County contempt wrote:

> There is no evidence that the words reached the ears of the jury, but this failure was not the fault of respondent. It is fortuitous that only three persons heard these words. But to use such language in a court room, referring to a judge, cannot be defended. I find it to be beyond redemption.

We find that respondent violated DR 1–102(A)(5), conduct prejudicial to the administration of justice, and DR 7–106(C)(6), undignified or discourteous conduct degrading to a tribunal, in the Essex matter; and DR 7–106(C)(7), the intentional violation of an established rule of procedure, in the Hudson matter. *See Vincenti*, 92 *N.J.* 591; *In re Yengo*, 92 *N.J.* 9 (1983).

We understand the enormous pressures of modern trial practice, especially for the single practitioner, to whom the calendar clerk or court attendant may often appear to be the enemy. It may be natural to vent this frustration on court officers or adversaries, but it cannot be permitted. Respondent's counsel has forcefully argued that we consider these pressures and the record's disclosure of personal tragedy that may have influenced respondent's plea to the Essex contempt. Still, we cannot disregard that we have previously disciplined respondent for courtroom misconduct. On that occasion, we said:

> ... We have respondent's assurance that he will never engage in another such altercation. However, we wish to make it perfectly clear that any future involvement in a similar episode will be a basis for more drastic disciplinary action than is imposed herewith. Respondent is hereby severely reprimanded for his conduct in question. [*In re McAlevy*, 69 *N.J.* 349, 352 (1976)].

More drastic disciplinary action must be imposed here. The only saving distinction between respondent's conduct and that in *Vincenti* is that in the latter the instances of misconduct included insulting written communications to the court that cannot in any way be attributed to forceful advocacy or the heat of a trial. Respondent's disciplinary record includes two other instances of trial misconduct. It goes without saying that any further trial misconduct on his part would be a grave mistake in judgment

reflecting upon his fitness to practice law. Respondent has been described as a "fine young man and a talented attorney." 69 *N.J.* at 352. That promise remains to be fulfilled.

## V.

Respondent is suspended from the practice of law for three months and until the further order of the Court. He is further required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including the cost of producing transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed* —None.

## ORDER

It is ORDERED that DENNIS D.S. McALEVY of HOBOKEN be suspended from the practice of law for three months, effective August 22, 1983, and until further order of this Court; and it is further

ORDERED that respondent reimburse the Administrative Office of the Courts for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that DENNIS D.S. McALEVY be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that DENNIS D.S. McALEVY comply with the Regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.