570 A.2d 416

IN THE MATTER OF JAMES B. DANIELS, AN ATTORNEY-AT-
LAW OF THE STATE OF NEW JERSEY,
DEFENDANT-APPELLANT.

Argued May 3, 1988—Decided February 28, 1990.

*Louis Raveson* argued the cause for appellant, James B. Daniels.

*Richard W. Berg,* Deputy Atty. Gen., argued the cause for respondent, Superior Court of New Jersey (*Cary Edwards,* Atty. Gen., attorney).

*Susan J. Abraham,* Asst. Deputy Public Defender, argued the cause for *amicus curiae,* Office of the Public Defender (*Alfred A. Slocum,* Public Defender, attorney).

*Eric Neisser,* Legal Director, submitted a letter brief on behalf of *amicus curiae,* American Civ. Liberties Union of New Jersey (*Edward Martone,* Executive Director, attorney).

*Morton Stavis* submitted a brief on behalf of *amicus curiae,* Center for Constitutional Rights.

*David A. Ruhnke* submitted a brief on behalf of *amicus curiae,* Ass'n of Crim. Defense Lawyers of New Jersey (*Ruhnke & Barrett,* attorneys).

*Alan L. Zegas* submitted a brief on behalf of *amicus curiae,* New Jersey State Bar Ass'n.

*Carl D. Poplar* submitted a letter brief on behalf of *amicus curiae,* Trial Attys. of New Jersey (*Poplar & Florio,* attorneys).

PER CURIAM.

Justice Felix Frankfurter wrote, dissenting in *Sacher v. United States,* 343 *U.S.* 1, 72 *S.Ct.* 451, 96 *L.Ed.* 717 (1952):

In administering the criminal law, judges wield the most awesome surgical instruments of society. A criminal trial, it has been well said, should have the atmosphere of the operating room. The presiding judge determines the atmo-

sphere. He is not an umpire who enforces the rules of a game, or merely a moderator between contestants. If he is adequate to his functions, the moral authority which he radiates will impose the indispensable standards of dignity and austerity upon all those who participate in a criminal trial.
[*Id.* at 37–38, 72 *S.Ct.* at 468–469, 96 *L.Ed.* at 738.]

This case tests the measure of the discharge of that responsibility by a trial judge. Specifically, the question is whether a judge may summarily punish for contempt an attorney who mockingly laughed at the court's rulings in an open proceeding.

Authors Norman Dorsen and Leon Friedman quote Justice Frankfurter when noting that the conduct of a modern criminal trial demands of a judge three distinct leadership qualities. N. Dorsen & L. Friedman, *Disorder in the Court: Report of the Association of the Bar of the City of New York, Special Committee on Courtroom Conduct* 192–93 (1973) [hereinafter Dorsen & Friedman]. Foremost, "a judge is, in the first place, a judge." *Id.* at 192. He or she is the reflective passive minister of justice neutrally resolving the questions of law and procedure involved in the matter. The judge is next a "traffic policeman," required to keep the extraordinary sustained flow of criminal trials moving with all deliberate speed. *Id.* at 193. Third, the judge is the exemplar of justice. "He personifies the abstract elements of the legal process—the need for fairness, understanding, and evenhanded application of the law." *Ibid.*

This role is a demanding one for any trial judge, and it is not trite to observe that what distinguishes our legal system from all others is our unflinching insistence on the dignity of the American courtroom as the ultimate repository of our liberties. Hence, we are satisfied that the judge's nondelegable duty to "impose the indispensable standards of dignity and austerity upon all those who participate in a criminal trial," *Sacher v. United States, supra,* 343 *U.S.* at 38, 72 *S.Ct.* at 469, 96 *L.Ed.* at 738, justifies the court's summary imposition of contempt on the attorney whose conduct threatened the dignity of that proceeding. We find, however, that although the attorney's conduct warranted censure, the procedures were not consonant

with the imposition of loss of liberty. We hold that the Appellate Division correctly vacated the jail sentence.

## I

The facts of this case are not particularly unusual. They disclose the kind of incident that might occur any day in a courtroom. For purposes of this appeal, we will accept the version of the facts set forth in the attorney's briefs.

James B. Daniels, an attorney with the Office of the Public Defender in the Union County region, represented a client in a criminal trial that began on March 18, 1986. During pretrial hearings, there was "long and passionate argument" over the admissibility of the results of certain polygraph (lie-detector) tests. Mr. Daniels moved to exclude the results of the State's lie-detector tests, or in the alternative to rebut the State's tests with expert testimony and/or the defendant's own lie-detector test results. The attorney had previously stipulated to the admissibility of the State's polygraph test and the inadmissibility of the defense test.[1] The court enforced the stipulation.

Mr. Daniels then moved that the court take judicial notice of certain scholarly articles so that Mr. Daniels could educate the jury on what he considered to be the crucial evidence in the case. The court denied that motion too after considerable oral argument. Defendant states that at this point "the court took exception to Mr. Daniels' response to his ruling," a reaction

---

[1] The attorney's brief recites that earlier, the client had taken a lie-detector test administered by a defense expert that demonstrated the client's innocence. Although Mr. Daniels sought to have the State dismiss charges on the basis of that test, the State would agree to do so only if the results of the prosecution's polygraph test concurred. As a condition of that agreement, however, the State also demanded a stipulation to the admissibility of its test results should they prove inculpatory. That stipulation, which Mr. Daniels executed, also provided that the results of the defense polygraph were inadmissible. Mr. Daniels sought to have the stipulation voided because, he said, the extremely contradictory results of the two tests clearly demonstrated the unreliability and lack of any probative value of those tests.

that the judge characterized as Mr. Daniels "sitting there shaking [his] head, smiling and being disrespectful." The judge warned Mr. Daniels that further display of disapproval with the court's rulings would result in incarceration. The attorney responded orally to the judge's admonitions, but the record does not include any reference by the stenographer that Mr. Daniels rolled his eyes or laughed aloud or employed a sarcastic tone in response to the court. Nor did the contemporaneous description of the event by the court indicate that Mr. Daniels did more than smile and shake his head in response to the original ruling.

Immediately following a short recess, the attorney apologized to the court, explaining that his reaction, shaking his head, was a "very human response" and assuring the court that he had intended no disrespect. The judge responded, "Put it behind us and forget about it." The remainder of the day was uneventful.

The second day of the pretrial proceedings opened with arguments on the admissibility of the victim's identification. Again the court ruled against the defendant. Following that ruling, Mr. Daniels sought permission to call a psychologist as an expert to testify to the underlying lack of reliability in the lie-detector test. The judge stated that he wished to think about the request, but that his initial response was negative. Most of the day was spent picking the jury.

Following jury selection but before the jury was sworn, and out of its presence, defense counsel moved for a mistrial. He relied on *State v. Gilmore,* 199 *N.J.Super.* 389, 489 *A.*2d 1175 (App.Div.1985), *aff'd,* 103 *N.J.* 508, 511 *A.*2d 1150 (1986), alleging that the prosecutor had used his peremptory challenges systematically to exclude black women from the jury. Defendant emphasizes that in the course of denying the *Gilmore* motion, the judge suggested that the motion was untimely despite the fact that it was made before the jury was sworn. The judge abruptly interrupted his ruling to criticize Mr. Dan-

iels' reaction to the court's ruling, stating, "Put on the record right now, you laughed, you rolled your head, you threw yourself back in your seat." As with the incident the day before, the judge's reaction was prompted by Mr. Daniels' physical reaction to the judge's ruling, not by any statement the attorney made.

Mr. Daniels immediately protested that the judge's characterization was not accurate. Defendant asserts that "[b]efore giving Mr. Daniels an opportunity to be heard as to either guilt or punishment [the court] found Mr. Daniels in contempt and released the jury, thereby terminating the proceeding." The court said: "I find you in contempt of court. You'll be able to respond right now. I declare that this jury will be released."

At that point the court discharged the jury. The court referred to the opinion of *State v. Vasky*, 203 *N.J. Super.* 91, 495 *A.*2d 1347 (App.Div.1985) (detailing contempt powers), and then declared: "I find you in contempt. You may be heard before I pass sentence." Mr. Daniels stressed that his actions were only a "human" reaction to his disappointment with the court's rulings and that he intended no disrespect, and denied again the judge's characterization of his conduct. He said, "I did nothing other than sit back in my chair, put my head down and cover my eyes when the Court ruled [against the *Gilmore* application]." He immediately objected further to the court's *Gilmore* ruling, and the judge responded, "Don't raise your voice." Defendant asserts that other persons present in the courtroom, including the court reporter and the judge's court clerk, later attested that as far as they were able to observe, Mr. Daniels did not throw himself back in his chair, laugh, or utter any sound prior to being held in contempt, nor did he sound sarcastic or disrespectful. However, we must deal with the record as we have it. The record discloses that Mr. Daniels was asked if he wished to call any witnesses. He declined. Mr. Daniels asked to consult with an attorney. The court refused that request. Defendant states that he was denied the opportunity to prepare his defense. Having been denied the

opportunity to speak to any prospective witnesses, he says that there was no other evidence that he could have offered in his defense.

Finding that Mr. Daniels had laughed at its rulings in open court, the court then found the defendant "in contempt of court," and proceeded to impose sentence. He said, "I find you in contempt of court and I sentence you to two days in the county jail and a $500 fine, which will be carried out immediately."

Defendant obtained a stay of imprisonment and of the fine. On March 24, 1986, five days later, the trial court issued a supplemental order of contempt. That order, in defendant's view, both elaborates on and conflicts with the contemporaneous record. On appeal, the Appellate Division affirmed the judgment of contempt, but it vacated the sentence of confinement. *In re Daniels*, 219 *N.J.Super.* 550, 530 *A.*2d 1260 (1987). In that court's view, imprisonment was not an appropriate punishment, inasmuch as harm to the judicial system was not severe and the $500 fine and rebuke in open court should have sufficient deterrent effect. *Id.* at 592, 530 *A.*2d 1260. One member dissented, finding no contempt as a matter of law, and suggesting an evidentiary hearing in another trial court. *Id.* at 592–93, 530 *A.*2d 1260 (Skillman, J.A.D., dissenting). Here, he emphasized, the contemptuous conduct, consisting of facial expressions and gestures, was not "unambiguously set forth on the trial record." *Id.* at 598, 530 *A.*2d 1260. We granted defendant's appeal as of right under *Rule* 2:2–1(a)(2), and his petition for certification, 109 *N.J.* 496, 537 *A.*2d 1287 (1987).

## II

### A.

There can be no doubt of the existence of the summary power of contempt. We may draw on the useful expression of the doctrine found in Justice Handler's concurring opinion in *In*

*re Yengo,* 84 *N.J.* 111, 130, 417 *A.*2d 533 (1980), *cert. denied,* 449 *U.S.* 1124, 101 *S.Ct.* 941, 67 *L.Ed.*2d 110 (1981).

[T]his case involves the inherent contempt power of the judiciary to challenge and punish affronts to its authority. It has long been recognized that there are occasions when this inherent authority must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures. *See In re Oliver,* 333 *U.S.* 257, 274, 68 *S.Ct.* 499, 508, 92 *L.Ed.* 682, 695 (1948); *Cooke v. United States,* 267 *U.S.* 517, 534, 45 *S.Ct.* 390, 394, 69 *L.Ed.* 767, 773 (1925); *Ex parte Terry,* 128 *U.S.* 289, 302–303, 9 *S.Ct.* 77, 79, 32 *L.Ed.* 405, 408 (1888). The summary contempt power is integrally related to judicial self-preservation. *State v. Zarafu,* 35 *N.J.Super.* 177, 182 [113 *A.*2d 696] (App.Div.1955). "The sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary not be frustrated." *In re Fair Lawn Education Ass'n,* 63 *N.J.* 112, 114–115 [305 *A.*2d 72], (1973), *cert.* den. 414 *U.S.* 855, 94 *S.Ct.* 155, 38 *L.Ed.*2d 104 (1973); *McAllister v. McAllister,* 95 *N.J.Super.* 426, 440 [231 *A.*2d 394] (App.Div.1967). This judicial "power is as ancient as the courts to which it is attached and 'as ancient as any other part of the common law.' " *In re Caruba,* 139 *N.J.Eq.* 404, 427 [51 *A.*2d 446] (Ch.1947), aff'd 140 *N.J.Eq.* 563 [55 *A.*2d 289] (E. & A.1947), *cert.* den. 335 *U.S.* 846, 69 *S.Ct.* 69, 93 *L.Ed.* 396 (1948) (quoting *Rex v. Almon,* 97 *Eng.Rep.* 94, 99 (K.B.1765)). (footnote omitted).

The New Jersey Code of Criminal Justice, while abolishing common-law crimes, preserves this judicial power to punish for contempt. *N.J.S.A.* 2C:1–5(c). The power is further defined by statute, *N.J.S.A.* 2A:10–1 to –8, and in our Rules of court. *Rule* 1:10–1 provides, "Contempt in the actual presence of a judge may be adjudged summarily by the judge without notice or order to show cause." The expressions "adjudged summarily" and "criminal contempt power" are familiar to judges and lawyers but may not be equally familiar to all others. Thus we explain. The phrase "contempt power" really means the power to punish, and in our society that means the power to fine or imprison one who has violated judicial authority. There are two strands to the contempt doctrine that are sometimes not easily separated in its fabric. One strand is "civil contempt"; the other is "criminal contempt." The labels that jurisdictions may place on the exercise of judicial power to punish are not significant. It is the substance that determines the outcome.

Civil contempt proceedings are primarily coercive; criminal contempt proceedings are punitive. As the Court explained in *Gompers [v. Buck's Stove & Range Co.,* 221 *U.S.* 418, 443, 31 *S.Ct.* 492, 498, 55 *L.Ed.* 797, 807 (1911) ], "[t]he

distinction between refusing to do an act commanded (remedied by imprisonment until the party performs the required act) and doing an act forbidden (punished by imprisonment for a definite term) is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment."

[*Hicks v. Feiock*, 485 *U.S.* 624, 646, 108 *S.Ct.* 1423, 1437, 99 *L.Ed.*2d 721, 741 (1988).]

Failure to pay alimony is a familiar example of the type of act cognizable in an action for civil contempt. *Id.* at 646, 108 *S.Ct.* at 1437, 99 *L.Ed.*2d at 741. One important indication of which contempt strand applies is whether the judgment inures to the benefit of another party to the proceeding, *i.e.,* is compensatory in nature, or vindicates the authority of the court, as does a fixed court fine. *Id.* at 646, 108 *S.Ct.* at 1437, 99 *L.Ed.*2d at 741. Another indication is the type of sentence imposed. Civil sanction requires incarceration only until compliance with a court order, whereas criminal sanction requires a fixed term. *Id.* at 646, 108 *S.Ct.* at 1437, 99 *L.Ed.*2d at 741.

Our current court Rules do not use the term "civil contempt"; rather, we view the process as one of relief to litigants. *R.* 1:10–5. Unlike criminal contempt, which can be initiated only by the court, civil contempt allows any litigant to invoke relief in aid of a judgment or order of a court. Those are not easy lines to draw in many cases, but this case is clearly one of criminal contempt. Daniels was *not* being imprisoned until he complied; he did not carry the "keys to the prison" in his pocket. *See Hicks v. Feiock, supra,* 485 *U.S.* at 646, 108 *S.Ct.* at 1437, 99 *L.Ed.*2d at 741. He was sanctioned for what he did.

### B.

What makes this case so important to bench and bar is the exercise of "summary contempt power." What that means is that punishment is imposed without the familiar procedures that ordinarily attend the criminal law.

The justification for that "extraordinary power to punish without the formalities required by the Bill of Rights for the prosecution of * * * crimes generally, is that the necessities of

the administration of justice require such summary dealings with obstructions to it. It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage." *Offutt v. United States,* 348 *U.S.* 11, 14, 75 *S.Ct.* 11, 13, 99 *L.Ed.* 11, 16 (1954). But the United States Supreme Court has observed that the outer limit of the contempt power is "the least possible power adequate to the end proposed." *Hicks v. Feiock, supra,* 485 *U.S.* at 637 n. 8, 108 *S.Ct.* at 1432 n. 8, 99 *L.Ed.*2d at 735 n. 8 (quoting *Shillitani v. United States,* 384 *U.S.* 364, 371, 86 *S.Ct.* 1531, 1536, 16 *L.Ed.*2d 622, 628 (1966); *Anderson v. Dunn,* 19 *U.S.* (6 Wheat.) 204, 231, 5 *L.Ed.* 242, 248 (1821)).

Concurring in the Court of Appeals judgment in *United States v. Sacher,* 182 *F.*2d 416, 455 (2d Cir.1950), *aff'd,* 343 *U.S.* 1, 72 *S.Ct.* 451, 96 *L.Ed.* 717 (1952), Judge Jerome Frank observed:

> Undeniably, to punish summarily for contempt—to charge and hold a man guilty of a crime without a trial—is, and should be, an extraordinary exception in a civilized legal system; ordinarily, in this country an accused person is constitutionally entitled to a trial and before someone other than his accuser. But Congress and the Supreme Court have recognized one exception: The statute and the Rule (promulgated by the Supreme Court) explicitly authorize a trial judge to punish summarily—without a trial before another judge—conduct (a) which is contemptuous and (b) which the judge "saw and heard," it being "committed in the actual presence of the court." The validity of that statute or of that rule is not challenged here by anyone.

Time has not altered the significance of Judge Frank's remarks.

█ This extraordinary power, then, should be exercised sparingly and only in the rarest of circumstances. When an attorney's conduct in the actual presence of the court has the capacity to undermine the court's authority and to interfere with or obstruct the orderly administration of justice, there can be no alternative but that a trial court assume responsibility to maintain order in the courtroom. This narrow exception to due-process requirements permits the imposition of sanctions only for "charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of

the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public." *In re Oliver,* 333 *U.S.* 257, 275, 68 *S.Ct.* 499, 509, 92 *L.Ed.* 682, 695 (1948) (quoting *Cooke v. United States,* 267 *U.S.* 517, 536, 45 *S.Ct.* 390, 394, 69 *L.Ed.* 767, 773 (1925)). The classic case for instant action is *Ex parte Terry,* 128 *U.S.* 289, 9 *S.Ct.* 77, 32 *L.Ed.* 405 (1888), in which an attorney, seeing his wife led from the courtroom by a United States Marshal, assaulted the marshal and was immediately held in contempt of court.

Necessity not only justifies the summary contempt power, but also limits that power by defining both settings for its exercise and procedural safeguards. *In re Fair Lawn Educ. Ass'n,* 63 *N.J.* 112, 114–15, 305 *A.*2d 72 (1973). With few exceptions, every contempt calls for an explanation. *In re Logan,* 52 *N.J.* 475, 477, 246 *A.*2d 441 (1968). Thus, even in summary contempt proceedings against an attorney, the attorney should be informed of the charge and given an opportunity either to dispel any possible misunderstanding or to present any exculpatory facts that are not known to the court. The provision for *de novo* appellate review of summary contempt convictions is a fail-safe mechanism for assuring that the contempt power is not abused. *In re Yengo, supra,* 84 *N.J.* at 135, 417 *A.*2d 533 (Handler, J., concurring) (judicial appellate review is a "judicial failsafe against not only trial court abuse, but trial court mistakes as well"); *see N.J.S.A.* 2A:10–3; *R.* 2:10–4 (authorizing review on facts as well as law); *see, e.g., In re DeMarco,* 224 *N.J.Super.* 105, 539 *A.*2d 1230 (App.Div.1988) (affirming contempt conviction after consideration *de novo* with independent findings).

Within this narrow exception to due-process requirements, contempt in the face of the court, the guarantee of right to counsel ordinarily does not apply. *In re Oliver, supra,* 333 *U.S.* at 275, 68 *S.Ct.* at 509, 92 *L.Ed.* at 695. Defendant points out that the United States Supreme Court has ruled, based on

sixth-amendment and due-process guarantees, that no one may be imprisoned for an offense if the party was denied the right to be represented by counsel at trial. *Argersinger v. Hamlin,* 407 *U.S.* 25, 37, 92 *S.Ct.* 2006, 2012, 32 *L.Ed.*2d 530, 538 (1972). The United States Supreme Court has also established right to counsel in a juvenile-delinquency case where civil proceedings resulted in institutional commitment. *In re Gault,* 387 *U.S.* 1, 87 *S.Ct.* 1428, 18 *L.Ed.*2d 527 (1967). We do not believe, however, that the guarantee of right to counsel limits the summary contempt power. Nor does our decision in *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 295, 277 *A.*2d 216 (1971) (requiring counsel for indigent defendant imprisoned or subjected to "other consequence of magnitude") mandate such limitation. Contempt proceedings are traditionally characterized as "sui generis,—neither civil actions nor prosecutions for offenses." *Myers v. United States,* 264 *U.S.* 95, 103, 44 *S.Ct.* 272, 273, 68 *L.Ed.* 577, 579 (1924). We agree with the Appellate Division that, especially where the party is an experienced trial attorney, the *Argersinger* due-process rationale does not require extending the right to counsel in a summary contempt proceeding. 219 *N.J.Super.* at 581, 530 *A.*2d 1260.

## C.

But whereas there is inherent in the court's power to punish contempts summarily some necessary diminishment of the ordinary "procedural due process accorded to the alleged contemnor," *In re Yengo, supra,* 84 *N.J.* at 122, 417 *A.*2d 533, we have always stressed that due process is a "dynamic concept," *Callen v. Sherman's, Inc.,* 92 *N.J.* 114, 136, 455 *A.*2d 1102 (1983), and that its "sense of fairness cannot be imprisoned in a crystal." *Id.* at 134, 455 *A.*2d 1102. The United States Supreme Court has developed, and we have emulated, *New Jersey State Parole Bd. v. Byrne,* 93 *N.J.* 192, 460 *A.*2d 103 (1983), a sliding scale for evaluation of due-process requirements depending on the nature of the liberty interest involved and the degree of reliability required in the fact-finding process. *See Morris-*

*sey v. Brewer,* 408 *U.S.* 471, 489, 92 *S.Ct.* 2593, 2604, 33 *L.Ed.*2d 484, 499 (1972) (parole revocation requires notice of charges, opportunity to present witnesses, and a "neutral and detached" hearing body). The greater the risk of error, the more the need for procedural safeguards.

Moreover, as the interests affected and need for reliability of fact-finding increase, the due-process rights of the party increase. Whether due process may require a particular step in the decision-making process is judged under the familiar three-part standard of *Mathews v. Eldridge,* 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976). The *Mathews* test considers three factors: (1) the private interest affected; (2) the risk of error and probable value of additional procedural safeguards; and (3) the government's interest. *Id.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33.

The need for reliability was heightened in this case, because the attorney's objectionable conduct was nonverbal, and the record does not so easily lend itself to validating the judge's factual findings. In many cases the record will clearly reveal the contemptuous conduct. *See, e.g., In re DeMarco, supra,* 224 *N.J.Super.* 105, 539 *A.*2d 1230 (transcripts disclose the insulting and demeaning conduct on the part of the attorney). And see Judge Hand's detailed recitation of facts plainly disclosed in the trial transcripts of *United States v. Sacher, supra,* 182 *F.*2d 416.

And there are some circumstances in which judge and lawyer may become embroiled in what may appear to be a personal confrontation, thus increasing the need for reliable fact-finding. The United States Supreme Court, in the exercise of its supervisory power over federal courts and not in the exercise of a constitutional mandate, has ruled that in such circumstances the better practice is that

> where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place.

[*Offutt v. United States, supra,* 348 *U.S.* at 14–15, 75 *S.Ct.* at 13–14, 99 *L.Ed.* at 16 (quoting *Cooke v. United States,* 267 *U.S.* 517, 539, 45 *S.Ct.* 390, 396, 69 *L.Ed.* 767, 775 (1925)).]

We have allowed the qualified exercise of judicial contempt power to imprison for violation of a court order, *see In re Buehrer,* 50 *N.J.* 501, 515, 236 *A.*2d 592 (1967), but required that "the summary power * * * be hemmed in by measures consistent with its mission"—there, a hearing before another judge.

Such procedures conform generally with the American Bar Association standards on use of the contempt power. *See* American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Judge's Role in Dealing with Trial Disruptions (May, 1971), *reprinted in* Dorsen & Friedman, *supra,* at 343–48. Those standards allow summary punishment beyond censure when contemptuous conduct is willful or the contemnor has been warned against it; require notice of charges and opportunity to be heard before sentence; and require referral to another judge if the presiding judge contributed to the contempt or if his objectivity could reasonably be questioned. *Ibid.*

To this we would add a special note of concern when we deal with imprisonment. There is a difference between money and freedom. No one can deny that the loss of liberty, next to the loss of life, is the greatest deprivation that a free citizen may suffer. In addition, imprisonment poses an extraordinary threat to the person who is imprisoned, both of violence in the prison setting, *see* Newark Star–Ledger, Jan. 17, 1990, at 36, col. 1 (man placed in an overcrowded county jail for traffic violations had his neck broken by another inmate), and the unknown and unanticipated reaction of the prisoner, *see Hake v. Manchester Township,* 98 *N.J.* 302, 486 *A.*2d 836 (1985). And, for an officer of the court, the indignity of imprisonment may be regarded as perhaps the greatest loss.

We agree that such procedures impose some burdens of administration, but we also agree with Justice Black, dissenting

in *Green v. United States*, 356 *U.S.* 165, 216, 78 *S.Ct.* 632, 660, 2 *L.Ed.*2d 672, 706 (1958), that when examined in closer detail, the argument of necessity contains another theme—that it will be "faster and cheaper * * *. But [at least when imprisonment is at stake] such trifling economies as may result have not generally been thought sufficient reason for abandoning our great constitutional safeguards aimed at protecting freedom and other basic human rights of incalculable value."

### III

How then do we apply these general principles to the myriad of instances in which a court may be called on to vindicate its authority and maintain order and dignity in the courtroom? The conduct may run the gamut from the obvious frontal assault on the system, *Ex parte Terry, supra*, 128 *U.S.* 289, 9 *S.Ct.* 77, 32 *L.Ed.* 405 (lawyer who assaulted marshal); to the demeaning of the system, *In re Yengo, supra*, 84 *N.J.* 111, 417 *A.*2d 533 (lawyer who cavalierly absented himself from a trial); the deception of the system, *Kerr Steamship Co. v. Westhoff*, 204 *N.J.Super.* 300, 498 *A.*2d 793 (Law Div.1985), *aff'd as modified*, 215 *N.J.Super.* 301, 521 *A.*2d 1298 (App.Div.1987) (witness who lied blatantly before the court); the flouting of the system, *In re Carton*, 48 *N.J.* 9, 222 *A.*2d 92 (1966) (lawyer who disobeyed a lawful order of the court); and, finally, here, as in *In re DeMarco, supra*, 224 *N.J.Super.* 105, 539 *A.*2d 1230, to the degrading of the system by insult to the court.

We wish that we could write a program that would outline the procedure to be followed in each case. We must continue, however, to repose a sound measure of discretion in our judges. The degree of procedure should in good measure accord with the judge's evaluation of the significance of the contempt on the system. Obviously, not every $25 fine on an attorney late for a calendar call is the occasion for the exercise of a full panoply of procedural rights. But the cases provide sound measure to guide the choice of procedures. For example, in *In*

*re Yengo, supra,* 84 *N.J.* 111, 417 *A.*2d 533, the court waited for an opportune time in the trial to adjudicate the contempt, once the attorney had returned to the courtroom, and did so without interruption of the trial. At the hearing, the attorney offered an explanation of his unapproved absence, but the court found it unsatisfactory and imposed a $500 fine. In *In re DeMarco, supra,* 224 *N.J.Super.* 105, 539 *A.*2d 1230, the court informed the attorney after each incident that a hearing on his alleged contemptuous conduct would be held. At the hearing, held after conclusion of the trial, the attorney was represented by counsel. After hearing the attorney's explanation, the court imposed a $500 fine.

■ Some of the steps a court should follow, then, are:

(1) It should immediately evaluate the gravity of the misconduct and decide whether it should invoke its right, power, and duty to charge or adjudicate the contempt. Conduct that falls short of contempt may be handled informally, outside the structure of *Rule* 1:10, some matters by a rebuke in chambers, some by reference to other disciplinary bodies. Conduct that amounts to contempt may require immediate action under *Rule* 1:10.

(2) Once the court has determined that it should exercise the contempt power, it should immediately inform the party that it considers the act contemptuous and afford the party an opportunity to retreat or explain the circumstances, and thus avoid, perhaps, any need for adjudication.

(3) Depending on the degree of the contempt, the court must evaluate whether it calls for immediate adjudication lest there be "demoralization of the court's authority" before the public. *Cooke v. United States,* 267 *U.S.* 517, 536, 45 *S.Ct.* 390, 394, 69 *L.Ed.* 767, 773 (1925). An example would be a witness or lawyer who refuses a lawful order of the court to cease interruption or to refrain from insult or invective in the course of a trial.

(4) If immediate adjudication of such conduct is called for, the court must evaluate whether the record will adequately disclose the essence of the contempt. As noted *supra* at 64, 570 *A.*2d at 423, in most instances of invective the record will adequately describe the misconduct. Other misconduct may be less graphic and call for fuller fact-finding. We need not, however, magnify what is a self-evident offense, such as an obscene gesture, into a mega-trial.

(5) If the contempt involves personal insult to the court (as opposed to other personnel in the system, as in *Ex parte Terry, supra,* 128 *U.S.* 289, 9 *S.Ct.* 77, 32 *L.Ed.* 405, or in *In re McAlevy,* 94 *N.J.* 201, 463 *A.*2d 315 (1983)), the court should consider whether there is any appearance of personal confrontation or loss of objectivity that would require reference of the matter to another judge.

(6) Finally, if the conduct appears to be such that imprisonment may be warranted and immediate action is not essential to prevent demoralization of the court's authority before the public, or to assure continuity of proceedings, as in the case of a continually disruptive spectator, both a more formal charging process and reference to another judge for adjudication and sentence would ordinarily be required in order to accord due process. The charge should particularly inform the party of the need to present evidence in mitigation, or, as here, to call the other witnesses in the courtroom to state their accounts of the event.

■ Applying the foregoing principles to the facts of this case leads us to agree substantially with the reasoning of the dissenting member of the Appellate Division and the result of the majority. Surely, if the underlying conduct occurred as found, the judgment of contempt was warranted. Contempt comprehends any act which is calculated to or tends to embarrass, hinder, impede, frustrate or obstruct the court in the administration of justice, or which is calculated to or has the effect of lessening its authority or its dignity; or which interferes with or prejudices parties during the course of litigation, or which otherwise tends to bring the authority and administration of the law into

disrepute or disregard. In short, any conduct is contemptible which bespeaks of scorn or disdain for a court or its authority. (Citations omitted).

[*In re DeMarco, supra*, 224 *N.J.Super.* at 116, 539 *A*2d 1230 (quoting *In re Callan*, 122 *N.J.Super.* 479, 494, 300 *A*.2d 868 (Ch.Div.), *aff'd*, 126 *N.J.Super.* 103, 312 *A*.2d 881 (App.Div.1973), *rev'd on other grounds*, 66 *N.J.* 401, 331 *A*.2d 612 (1975)).]

The conduct occurred in the judge's immediate presence, was witnessed by him, and was, if not "an open threat to the orderly procedure of the court, * * * a flagrant defiance of the person and presence of the judge before the public." *Cooke v. United States, supra*, 267 *U.S.* at 536, 45 *S.Ct.* at 394, 69 *L.Ed.* at 773; *see also In re Stanley*, 102 *N.J.* 244, 246–47, 507 *A*.2d 1168 (1986) (laughing and facial grimaces directed at judge part of contemptuous conduct).

■ We agree with the Appellate Division that the fact that the judge used the words "I find you in contempt" before giving defendant the opportunity to speak did not abridge his right to be heard. 219 *N.J.Super.* at 577–78, 530 *A*.2d 1260. Of course, the accused is entitled to the presumption of innocence and his or her guilt must be proven beyond a reasonable doubt. *In re Buehrer, supra*, 50 *N.J.* at 516, 236 *A*.2d 592. Yet the words themselves should not control where the one charged with contempt is actually permitted to respond, as Daniels was here. *See Vasky, supra*, 203 *N.J.Super.* at 100, 495 *A*.2d 1347. His guilt was not truly adjudged until after he had defended himself.

Defense counsel urges that "[l]awyers who lose their cool are not lawyers who intend to obstruct justice." We are satisfied that the Appellate Division adequately resolved the question of whether defendant's infraction was "knowing and willful and evidence[d] an intent to flout the authority of the Court." *In re Mattera*, 34 *N.J.* 259, 273, 168 *A*.2d 38 (1961). With respect to the question of intent, "the minimum standard is one of a voluntary action known by the actor to be wrongful or one that he reasonably should have been aware was wrongful." *In re Dellinger*, 461 *F.*2d 389, 400 (7th Cir.1972). Here the court had previously warned the attorney on the obstructive nature of the

conduct, and we are satisfied that the conduct had the capacity to obstruct the administration of justice. To say that mocking gestures cannot obstruct the administration of justice is to ignore the essence of the judicial process of "sifting through conflicting versions of the facts to discover where the truth lies, and applying the correct legal principles to the facts as found. Under the best of circumstances these tasks are difficult; without an orderly environment they can be rendered impossible." *In re Vincenti*, 92 *N.J.* 591, 603–04, 458 *A.*2d 1268 (1983).

Moreover, the threat was not remote. This is not a case in which a judge used contempt proceedings to punish for speech outside the courtroom critical of his rulings. *See Craig v. Harney*, 331 *U.S.* 367, 67 *S.Ct.* 1249, 91 *L.Ed.* 1546 (1947); *see also Bloom v. Illinois*, 391 *U.S.* 194, 202–04, 88 *S.Ct.* 1477, 1482–84, 20 *L.Ed.*2d 522, 529–30 (1968) (recounting impeachment and 1831 acquittal of federal district court judge James Peck, for imprisoning and disbarring lawyer who published criticism of judge's opinion in case on appeal, and subsequent statutory curtailment of contempt power).

██ We can well understand the mounting frustrations that this attorney had faced in confronting scientific evidence that he believed to be unreliable. It helps to explain his reaction but does not excuse it. Still, before imposing a punishment of imprisonment for such conduct, we must take care that the process accords with the interests involved and must assure the reliability of the fact-finding. The ancient justification for contempt, namely, the necessity to prevent "demoralization of the court's authority" before the public, *Cooke v. United States, supra*, 267 *U.S.* at 536, 45 *S.Ct.* at 394, 69 *L.Ed.* at 773, cannot realistically be effectuated by the jailing of an attorney in the midst of a criminal trial. *See Sacher v. United States, supra*, 343 *U.S.* 1, 72 *S.Ct.* 451, 96 *L.Ed.* 717 (justifying delay in disposition of contempt proceedings until conclusion of trial). Hence, in most cases, a court may adjudge the contempt either at the end of trial, or, as in *In re Yengo, supra*, 84 *N.J.* 111, 417

*A*.2d 533, at an opportune recess in the trial. Although conclusion of a trial does not automatically require more than summary proceedings, it is an important factor in the choice of procedure. *See United States v. Lumumba*, 741 *F*.2d 12, 16 (2d Cir.1984). In this case the trial had been terminated. Because the proceedings involved imprisonment of the attorney, the procedures failed to afford the process due in such circumstances. No discredit is intended or due to the trial judge, who followed prior precedent in proceeding as he did.

## IV

During a particularly troublesome period of misconduct in American courtrooms, Professor Paul Freund eloquently summarized the pith of the problem:

> In thinking of the disorders that have been taking place in courtrooms over the country, and the proper way to deal with them, I keep recalling a conversation in a plane leaving London a few years ago. My neighbor on the plane introduced himself as a Latvian who had settled in England by way of South Africa. When he learned that I was a lawyer he recounted an item in the English press a week before, telling of a defendant who, on being invited to address the court before sentencing, proceeded to utter a tirade against the judge. At the end the judge adjourned court for twenty-four hours, saying that he did not trust himself to impose sentence at that time. My companion then said, in a deeply stirred, almost reverential tone, "Where else in the world could you find such justice!"
>
> The right blend of firmness and forbearance, of respect for the dignity of one's office and for the humanity of its contemnors, is as difficult to achieve as it is universally moving when it occurs.
>
> [Freund, "Contempt of Court," 1 *Human Rights* 4, 4 (A.B.A. Section of Individual Rights and Responsibilities, 1970).]

This is the ideal to which we aspire. It is not always easy to attain or maintain in an era of congested court calendars. Dignity and decorum are strained. But that should not occasion an insult to the court. And there is no inhibition of advocacy here. As was said by Justice Jackson, himself a great trial lawyer, courts "will not equate contempt with courage or insults with independence," *Sacher v. United States, supra,* 343 *U.S.* at 13–14, 72 *S.Ct.* at 457–58, 96 *L.Ed.* at 726, but courts must "protect the processes of orderly trial, which is the

supreme object of the lawyer's calling," *id.* at 14, 72 *S.Ct.* at 457, 96 *L.Ed.* at 726. Lawyers are officers of the court and ministers of justice, no less than the judge. As such they bear some of the same responsibility as a judge to conduct them- selves with dignity, for the sake of maintaining the supreme importance of the court. See *In re Carton, supra,* 48 *N.J.* at 17–19, 222 *A.*2d 92 (citing Canon No. 1, Canons of Professional Ethics).

Our experience tells us that it will be the rarest occasion for a New Jersey court to be required to use the contempt power to impose substantial discipline on an attorney. When it comes to the obligations of attorneys, we have made it clear that lawyers who turn a courtroom into theater will be on the outside looking in for a long time. *See In re McAlevy, supra,* 94 *N.J.* 201, 463 *A.*2d 315 (attorney suspended for discourteous conduct); *In re Vincenti, supra,* 92 *N.J.* 591, 458 *A.*2d 1268 (attorney suspend- ed for, among other things, spoken attacks in the courtroom). A lawyer who mocks a judge's ruling violates the canons of our professions. He can be dealt with swiftly and surely.

But if a court believes that the affront to justice calls for the exercise of its contempt power, the procedures should accord with the degree of the interests involved and the need for reliable fact-finding. In most cases that means that a court confronted with a mid-trial contempt will give immediate notice of intent to treat the conduct as contemptuous. The party may later retreat from or explain the apparent contempt. *See In re Logan, supra,* 52 *N.J.* 475, 246 *A.*2d 441.

Should it be necessary to adjudge the contempt when the party is exposed to a loss of liberty, the adjudication of the contempt should be made by another judge unless there is no other way to continue the trial. That adjudication can be on the basis of the record certified to that court, supplemented by any further oral or written submissions. Obviously, in such a proceeding the party charged would have a right to be repre- sented by counsel.

Finally, in all contempt cases in which the detachment of the court may reasonably be questioned, a hearing before another judge is desirable. *See Mayberry v. Pennsylvania*, 400 *U.S.* 455, 466, 91 *S.Ct.* 499, 505, 27 *L.Ed.*2d 532, 540 (1971) (remanding to a judge "other than the one reviled by the contemnor"). We emphasize, as did Justice Frankfurter in *Offutt, supra*, 348 *U.S.* at 14, 75 *S.Ct.* at 13, 99 *L.Ed.* at 16, that "justice must satisfy the appearance of justice."

We find in the circumstances of this case that the attorney has not suffered a consequence of magnitude by virtue of the appellate disposition. The adjudication of contempt is not an adjudication of criminal conduct on the part of the attorney. *See In re Buehrer, supra*, 50 *N.J.* at 518, 236 *A.*2d 592. Nor do we believe that the record denotes a loss of detachment by the trial court sufficient to invalidate the adjudication. The court did not bang the gavel on counsel; rather, it terminated the proceedings that could no longer be conducted in an orderly fashion, and afforded defendant the right to be heard and, in essence, the right to retreat from the contempt. Defendant continued to maintain that he had done nothing to offend the dignity of the court. But the court saw and heard the conduct of defendant. Because the trial court may have anticipated the imposition of a jail term, as evidenced by the actual sentence, we would prefer that the matter have been heard by another judge. But we are satisfied that the Appellate Division adequately reviewed the record and made independent findings of fact sufficient to sustain its sanction.

Thus far we have been spared in New Jersey, for the most part, the incivility that has begun to mark the practice of law elsewhere. *See* National Law Journal, Jan. 15, 1990, at 1, col. 3 (hardball, "Rambo-style" litigation tactics on the rise); New York Times, Aug. 5, 1988, at B5, col. 1 (many attorneys say litigation is war, advocating a "scorched earth" policy). These are the expressions of people who have undoubtedly never experienced the realities of which they speak, else they would

not wish to import them into the practice of law. We have another vision of lawyers.

We recently had occasion to restate it.

One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers.

[*In re Vincenti, supra,* 92 *N.J.* at 603, 458 *A.*2d 1268 (quoting *Schware v. Board of Examiners,* 353 *U.S.* 232, 247, 77 *S.Ct.* 752, 760, 1 *L.Ed.*2d 796, 806 (1957) (Frankfurter, J., concurring)).]

From a profession charged with such responsibilities, we expect always the truth-speaking and sense of honor embodied in granite character. As applied to the conduct of lawyers, that translates into a requirement that "lawyers display a courteous and respectful attitude not only towards the court but towards opposing counsel, parties in the case, witnesses, court officers, clerks—in short, towards everyone and anyone who has anything to do with the legal process." *Ibid.*

The judgment of the Appellate Division is affirmed.

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN join in this opinion.

*For affirmance* —7.